Dahlberg, by Guardian *ad litem,* and another, Appellants,
vs. Jones, Administratrix, Respondent.

*April 12—June 21, 1939.*

*W. G. Haddow* of Ellsworth and *C. G. Anderson* of Hibbing, Minnesota, for the appellants.

For the respondent there were briefs by *Doar & Knowles* of New Richmond and *Irwin E. Magee* of Ellsworth, and oral argument by *W. T. Doar*.

The following opinion was filed May 9, 1939:

WICKHEM, J. Arthur F. Dahlberg and his wife, Gladys, are residents of Minnesota. They were married in 1918. In the fall of 1936 Mrs. Dahlberg became ill with a malady which was diagnosed as nervousness and stuporous depression. After consulting with a mental specialist in St. Paul she was taken to the hospital of Dr. Jones in Prescott, Wisconsin, on February 17, 1937. Dr. Jones' hospital was a private institution consisting of a main building, two cottages, and quite extensive grounds, located upon a lake shore. Dr. Jones was the proprietor of the hospital, assisted by two other doctors who were consulting physicians. On the day in question there were twenty-eight or twenty-nine patients in the main building and also patients in the cottages. Some of the windows in this building were barred and others were not. On the afternoon of February 17, 1937, Mrs. Dahlberg was brought to the hospital by her husband and by her sister, Elsie Cook. At the hospital there was a consultation over the case between Dr. Jones and Mrs. Cook. This had to do with Mrs. Dahlberg's health and background, family life,

etc. During this conversation Mrs. Cook testified: "We discussed that she would have to have special care and she would have to be watched." She was assigned a room on the second floor on the side of the building toward the lake. The windows of her room were furnished with guards and storm windows. The room was on the same floor as the living room, which was only a few feet away. There were no guards upon the living-room windows and these could easily be raised. The door to Mrs. Dahlberg's room was not locked, and on the night of February 22d, was left ajar. Some of the windows in the hospital were locked and others were not. The doors were fastened. At 5:45 in the morning of February 23d one of the nurses went to Mrs. Dahlberg's room and had a conversation with her. About five minutes later a nurse heard a noise upstairs and found that Mrs. Dahlberg had left her room, gone through a hall into the living room, raised the sash, pushed out the storm window and stepped out onto the ground, clad only in her nightgown. The temperature was two degrees above zero. Dr. Jones was immediately notified by telephone. He lived about two blocks from the hospital. He went at once to the lake shore and after searching in that vicinity came back to the hospital, found Mrs. Dahlberg's tracks, and traced her to an outhouse on the premises. The patient was returned to the hospital about 7:30. Her legs and arms were swollen and feet frozen. She was in a state of shock and began to run a high temperature. Thereafter, she was removed to another hospital and ultimately her mental condition became such as to require commitment to an insane asylum. Her mental condition has not improved since her commitment.

Plaintiff appeals from the portions of the order reducing the damages and eliminating the items of damage connected with aggravation of her mental condition. Defendant moves to review upon the ground that there was no evidence of a failure of duty on the part of the hospital and that there should have been a directed verdict. It will be convenient to consider defendant's motion first.

The duty of a hospital conducted for private gain is thus stated in *Maki v. Murray Hospital,* 91 Mont. 251, 268, 7 Pac. (2d) 228:

"A hospital conducted for private gain is not an insurer of its patients against injury inflicted by themselves, but is only required to use ordinary and reasonable care and diligence in the treatment and care of patients; . . . the degree of such care should be in proportion to the physical and mental ailments of the patient rendering him unable to look after his own safety."

As particularly applied to hospitals receiving patients for the treatment of nervous and mental diseases the following statement by this court discloses the scope of the duty. In *Torrey v. Riverside Sanitarium,* 163 Wis. 71, 75, 157 N. W. 552, it is said:

"Doubtless it is incumbent on the defendant and its employees at all times during the treatment of nervous and insane patients to use such means to restrain and guard them as would seem reasonably sufficient to an ordinarily prudent man under like circumstances to prevent such an occurrence as took place here, and for breach of that duty liability will arise, if such breach proximately causes injury to another."

A careful consideration of the evidence leads to the conclusion that neither Dr. Jones nor any of his employees connected with the hospital had any reason to suppose that Mrs. Dahlberg required special restraint in order to avoid escapes or attempts at suicide by her. The evidence discloses at the time of admission to the hospital a relatively mild case of nervous disorder and mental depression, and there is no evidence from which a jury could conclude that upon what they knew up to the time of the escape Dr. Jones or the hospital staff had reasonable grounds to anticipate or to take precautions against suicide or escape. In applying the above-quoted rule to the facts involved in the *Torrey Case,* this court said:

"It is to be remembered that the patient in question never exhibited symptoms of violence; that he came to the institution voluntarily and was apparently normal and entirely tractable."

In applying the same rule the Missouri court in *Breeze v. St. Louis & S. F. R. Co.* 264 Mo. 258, 263, 174 S. W. 409, stated:

"There was no evidence introduced tending to show that the deceased was possessed of suicidal mania, or mania of any kind, for that matter, at most that he was insane at intervals, but no indication whatever, prior to the fatal leap, that he intended to do himself or any one else any personal harm. In the absence of such showing there was no evidence tending to show that the defendant had any reason to anticipate that the deceased contemplated self-destruction."

In *Hohmann v. Riverlawn Sanatorium,* 103 N. J. Law, 458, 459, 135 Atl. 817, plaintiff's intestate was admitted to defendant hospital for treatment and examination as to his mental condition. He had made two unsuccessful attempts to take his life prior to entering the sanatorium. He later disappeared from the sanatorium and committed suicide. In affirming judgment of nonsuit, the court said:

"There was no duty of restraint owing from respondents toward appellant's intestate. He was not admitted to the sanatorium under any provision for restraint or confinement as the result of legal proceedings, nor did he voluntarily impose restraint and custody upon himself by his agreement with respondents, but by such agreement he was admitted as a patient for observation and medical treatment only."

The foregoing observations are all applicable to this case. We do not discover the slightest evidence that Mrs. Dahlberg was considered a proper subject for special restraint, or that her history would arouse concern that she would escape or inflict injury upon herself if not restrained. She was admitted for treatment and not committed for restraint; she came voluntarily to the hospital and conducted herself in a mild and docile manner. Her conduct in this respect continued until the moment of escape. Hence, it is our conclusion that so far as this case is based upon the escape from the hospital it presents no jury question. A verdict finding negligence in this respect has no support in the evidence.

There is another aspect to this case, however, that has given us some concern. Mrs. Dahlberg escaped from the hospital at about 5:55 a. m. This fact was promptly reported to Dr. Jones and he came to the hospital grounds and began a search of the premises immediately. This search was unsuccessful until he returned to the hospital, picked up the patient's tracks, and by following them located and returned her to the hospital. The period of her absence was about one and three-quarters hours. Most of plaintiff's physical shock and injury was the result of long exposure, thinly clad, to the extreme cold. We conclude that there was a jury question whether Dr. Jones and his staff discharged their duty of due care after discovering the patient's escape from the hospital. It appears to us that it was within the province of a jury to conclude that the nurses might have prevented the extended exposure of the patient had they made immediate pursuit, and that Dr. Jones was negligent in not doing in the first place what he ultimately did successfully, locate the tracks of the patient and follow them.

In view of this it becomes necessary to consider the scope of the issues submitted to the jury. In the third question the jury was asked whether Dr. Jones and his nurses failed "to use such means to restrain and guard her as would seem reasonably sufficient to an ordinarily prudent man under like circumstances to prevent her from escaping and injuring herself." Literally speaking, this covers the issue of the conduct of Dr. Jones and his employees after the escape. The complaint, liberally construed, is broad enough to charge negligence in this respect. The difficulty is that upon this assumption the third question is double and it cannot be determined whether the affirmative answer was based upon negligence in permitting the escape or whether it was based in whole or in part upon a conclusion that due care was not exercised in returning her to the hospital. In view of these considerations and because we feel that the only matter upon which there was an issue of fact was not adequately pre-

sented to or passed upon by the jury, it is our conclusion that there should be a new trial in this case. There is a jury issue, and we think that justice requires that a trial be had upon this issue.

We concur in the conclusion of the trial court that the compensatory damages assessed were excessive. The award was $5,000. The physical damages were shock, some pain and suffering, some injuries to the legs and feet and to the skin of the patient, and the loss of a portion of the second toe as a result of the freezing. Aside from this the damages do not appear to be permanent nor are they serious enough to warrant the imposition of as large a sum as $5,000. We also concur in the trial court's conclusion that the evidence does not sustain the jury's finding that the patient's mental condition was aggravated by the exposure. It consists of the opinions of two doctors, neither of whom specialized in mental or nervous diseases, and neither of whom had ever seen Mrs. Dahlberg, that her mental condition was aggravated by the shock. These opinions were given in response to hypothetical questions which briefly detailed the history of the patient and the facts and physical consequences of the exposure. This evidence does not sustain the jury's findings. The nature and extent of the mental impairment attributable to defendant's negligence is left wholly to conjecture. Mrs. Dahlberg was not a normal person but had a nervous and mental disorder the nature and probable outcome of which even with proper treatment is not disclosed by the evidence. To merely introduce the evidence of doctors that this condition, whatever it was, was aggravated by the events upon which the action is based gives the jury no assistance of any substance. It does not disclose that a curable condition was rendered incurable, a temporary one made permanent, or that a disease that was bound ultimately to develop to serious proportions was accelerated. It does not reveal to what extent the shock of exposure contributed to the progress of the disease. These matters are not merely

important but essential. Insanity is a highly specialized field and one which offers considerable difficulty to those who make its study a life work. It is a matter of some notoriety that shock is used in the treatment of some forms of it. In others, for all we know, it may be extremely injurious. If injurious, its effects may be temporary or permanent. If a jury is to award damages for this type of injury there must be evidence upon which they can do something more than guess at the probable results of defendant's alleged breach of duty. In the state of this record the nature and extent of such effects as defendant was responsible for could only be guessed at.

The foregoing conclusions require that there be a new trial, and in view of this we find it unnecessary to discuss or determine the several assignments of error based upon the admission or exclusion of evidence.

*By the Court.*—The order appealed from is modified by striking therefrom the option to plaintiffs to take judgment for the diminished sums fixed by the court, and the cause remanded for a new trial in accordance with this opinion. No costs to be taxed upon this appeal. Appellant to pay the clerk's fees.

A motion for a rehearing was denied, with $25 costs, on June 21, 1939.