BOGUST and wife, Appellants, v. IVERSON, Respondent.

*March 9—April 5, 1960.*

130

For the appellants there was a brief by *Eisenberg &*
*Kletzke,* attorneys, and *John W. Bernard* and *Alvin H.*
*Eisenberg* of counsel, all of Milwaukee, and oral argument
by *Mr. Bernard* and *Mr. Alvin H. Eisenberg.*

For the respondent there was a brief by *Slocumb, Bundy,*
*Carey & Solberg* of Menomonie, and oral arguments by
*James G. Solberg.*

Briefs were filed by *Hart, Kraege, Jackman & Wightman*
of Madison, for the Wisconsin Education Association; by
*Arthur B. Hanson* and *Emmett E. Tucker, Jr.,* attorneys,

and *Elisha Hanson* of counsel, all of Washington, D. C., for the American Personnel & Guidance Association; and by *Henry E. Butler, Jr.*, of Washington, D. C., for the National Education Association, *as amici curiae.*

MARTIN, C. J. Defendant is "an educator by profession." Jeannie Bogust was born May 3, 1939. At the times referred to in the complaint she was a pupil at Stout State College where defendant was employed as a full-time director of student personnel services and professor of education with a Ph. D. degree. It is alleged that in such capacity the defendant was "charged with the maintenance of a counseling and testing center for personal, vocational, educational, scholastic, or other problems, including those students torn by conflicting feelings which cause worry and social ineffectiveness."

The complaint states that commencing in November, 1957, Jeannie, as a student of the college, was under the direct guidance and supervision of the defendant; that defendant administered to her aptitude and personality tests and he was familiar with her personal, social, and educational problems and her conflicting feelings, environment, and social ineffectiveness; that he was well aware of her emotional disturbances, social conflicts, scholastic difficulties, and personal problems during the period of November 11, 1957, through April 15, 1958; and—

". . . that although said student was constantly in need of professional guidance after April 15, 1958, said defendant suggested termination of future interviews regarding her problems; that as a result of the failure of proper guidance by said defendant as aforesaid, she suffered psychological and emotional injuries and disturbances depriving her of her own volition and resulting in death by her own hand on May 27, 1958."

It is alleged:

"That said defendant negligently and carelessly failed to perform his duties as such director in the following:

"(a) That he failed to secure or attempt to secure emergency psychiatric treatment after he was aware or should have been aware of her inability to care for the safety of herself.

"(b) That he failed at all times to advise the said parents of Jeannie Bogust or contact them concerning the true mental and emotional state of their said daughter, thus preventing them from securing proper medical care for her.

"(c) That he failed to provide proper student guidance."

For the purposes of this decision we can assume the truth of only such allegations as are material statements of fact. Statements which are conclusions are not admitted by demurrer. *Mitchell v. Horicon* (1953), 264 Wis. 350, 59 N. W. (2d) 469.

"A demurrer to a complaint admits all the facts therein well pleaded, but it does not admit erroneous conclusions drawn from such facts by the pleader even though the conclusions bear the semblance of statements of fact." *Northwestern Mut. Life Ins. Co. v. State* (1920), 173 Wis. 119, 125, 180 N. W. 138.

The first question presented on appeal is whether there is a legal duty on the part of the defendant of such nature as will sustain this action. As pointed out by the trial court, before liability can attach there must be found a duty resting upon the person against whom recovery is sought and then a breach of that duty. *Palmer v. Janesville Improvement Co.* (1928), 195 Wis. 607, 219 N. W. 437; *Miller v. Welworth Theatres* (1956), 272 Wis. 355, 75 N. W. (2d) 286.

Defendant is not a person qualified as a medical doctor or a specialist in mental disorders. It is alleged that he is

an "educator by profession," a professor of education with a Doctor of Philosophy degree. Admitting that a teacher is not an insurer of the health, welfare, and safety of his students, *Grosso v. Wittemann* (1954), 266 Wis. 17, 62 N. W. (2d) 386, plaintiffs argue that he does have the duty to use reasonable care, citing the *Grosso Case* and Restatement, 2 Torts, p. 868, sec. 320:

"*b. Helplessness of other.* . . . So too, a child while in school is deprived of the protection of his parents or guardian. Therefore, the actor who takes custody of . . . a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him. . . .

"*d. Duty to anticipate danger.* One who has taken custody of another may not only be required to exercise reasonable care for the other's protection when he knows or has reason to know that the other is in immediate need thereof, but also to make careful preparations to enable him to give effective protection when the need arises, and to exercise reasonable vigilance to ascertain the need of giving it. . . ."

The three acts of negligence with which the defendant is charged in the complaint are grounded on the theory that he had such a familiarity with and knowledge of Jeannie's problems and her "emotional disturbances, social conflicts, scholastic difficulties" that in the exercise of reasonable intelligence and judgment he should have realized her need for psychiatric treatment and acted accordingly—in securing such treatment, in advising her parents, and in providing proper guidance.

The trial court held:

"To hold that a teacher who has had no training, education, or experience in medical fields is required to recognize in a student a condition, the diagnosis of which is in a specialized and technical medical field, would require a duty beyond reason."

Plaintiffs allege defendant was charged with the maintenance of a counseling and testing center for various educational, vocational, and personal problems which students of the college might have, but that fact does not qualify him as an expert in the field of medicine or psychiatry. Granting that he had some knowledge of Jeannie's emotional and other difficulties as the result of his meetings with her during a period of five months, as a teacher he cannot be charged with the same degree of care based on such knowledge as a person trained in medicine or psychiatry could exercise.

The first act of negligence alleged is that the defendant failed to secure psychiatric treatment for Jeannie "after he was aware or should have been aware of her inability to care for the safety of herself." This clearly implies that he should have known she had suicidal tendencies. But there is no allegation of fact that would have apprised the defendant, as a reasonably prudent man, that she had such tendencies. The statement is merely a conclusion. The same comment applies to the second act of negligence alleged, that of failing to advise the parents "thus preventing them from securing proper medical care for her." The duty of advising her parents could arise only from facts establishing knowledge on the part of defendant of a mental or emotional state which required medical care; and no such facts are alleged.

The allegation that defendant failed to provide proper student guidance apparently refers to the fact that he "suggested termination of future interviews regarding her problems."

Jeannie was suffering from emotional disturbances and social conflicts before she came under defendant's guidance. Plaintiffs rely on the "further harm" doctrine defined in

Restatement, 2 Torts, p. 872, sec. 322, where it is stated, in part, comment $d$:

"The liability which this section recognizes is not imposed as a penalty for the actor's original misconduct, but for a breach of a separate duty to aid and protect the other after his helpless condition caused by the actor's misconduct is or should be known."

There is no allegation that the interviews between the defendant and Jeannie benefited her or that there was a duty on his part to continue them or that their termination caused the injury or placed her in a worse position than she was when they were begun. See Restatement, 2 Torts, p. 873, sec. 323 (2):

"One who gratuitously renders services to another, otherwise than by taking charge of him when helpless, is not subject to liability for discontinuing the services if he does not thereby leave the other in a worse position than he was in when the services were begun."

Jeannie had various problems before the interviews were undertaken, but was she "helpless" in that she was unable to look after her own safety? There is no allegation of such a fact, as pointed out above. Nor is there any allegation that she became so "helpless" during the time the interviews were carried on or that, if she did, she exhibited such manifestations as would charge the defendant with knowledge thereof.

The allegation in point is that although the deceased was in need of professional guidance after April 15, 1958, the defendant suggested termination of the interviews and that:

". . . as a result of the failure of proper guidance by said defendant as aforesaid, she suffered psychological and emotional injuries and disturbances depriving her of her own

volition and resulting in death by her own hand on May 27, 1958."

We may assume the interviews were terminated, although the act complained of is the *suggestion* that they be terminated. There is no allegation that defendant's counseling caused injury. The only question is whether, at the time he suggested the interviews be terminated, he should reasonably have foreseen, acting as an ordinarily prudent and intelligent person, that as a consequence thereof Jeannie would do harm to herself, *i.e.,* commit suicide.

In *Dahlberg v. Jones* (1939), 232 Wis. 6, 11, 12, 285 N. W. 841, it was held that where a mental patient was under the care of a doctor in a private hospital, the degree of care owed such patient " 'should be in proportion to the physical and mental ailments of the patient rendering him unable to look after his own safety.' " In that case such a patient suffered injuries as the result of escaping from the hospital, and this court held there was no liability on the hospital where there was no evidence to support the conclusion that the doctor or the hospital staff had reasonable grounds to anticipate or to take precautions against suicide or escape. The court referred to language used in applying the same rule in *Breeze v. St. Louis & S. F. R. Co.* (1915), 264 Mo. 258, 263, 174 S. W. 409:

"There was no evidence introduced tending to show that the deceased was possessed of suicidal mania, or mania of any kind, for that matter, at most that he was insane at intervals, but no indication whatever, prior to the fatal leap, that he intended to do himself or anyone else any personal harm. In the absence of such showing there was no evidence tending to show that the defendant had any reason to anticipate that the deceased contemplated self-destruction."

Paraphrasing the above, in this case we can substitute for evidence or proof the fact that the complaint contains

no allegation of a suicidal tendency or mania or any indication that Jeannie showed any disposition to injure herself.

If a hospital for the treatment of mental disorders cannot be held liable for self-injury of a patient where there is no evidence (allegation) that the patient would injure herself if not restrained, certainly the mere allegation of an awareness by a teacher of emotional disturbance and personal problems of a student is insufficient to support an action for death by suicide.

The suicide took place almost six weeks after defendant suggested terminating the interviews. The complaint alleges that Jeannie's loss of volition occurred after the interviews terminated. To hold that the termination was a negligent act, it must be alleged that defendant knew or should have known that Jeannie would commit suicide.

This is an action for wrongful death under sec. 331.03, Stats. The basic theory of plaintiffs' complaint and their argument on appeal is the foreseeability of Jeannie's suicide as the proximate result of defendant's acts and omissions. In a lengthy discussion in 11 A. L. R. (2d), Liability for Suicide, p. 756, sec. 2, it is stated:

"Where an action is brought under a wrongful-death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable."

The only cases noted where the wrongful act is considered as within and part of the line of causation is where the wrongful act produces a rage or frenzy or uncontrollable impulse, during which state self-destruction takes place. In *Daniels v. New York, N. H. & H. R. Co.* (1903), 183 Mass. 393, 67 N. E. 424, 426, 62 L. R. A. 751, decedent had been injured by a blow on the head in a collision of his automobile with the defendant's train and the injury caused

him to become insane. Two months later he took his own life. The court held (p. 399):

". . . we are of opinion that the liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of death that immediately ensues."

Plaintiffs plead that, as the result of defendant's suggestion that the interviews be terminated, Jeannie suffered mental injury depriving her of her own volition and resulting in her death. In the absence of any allegation of fact in that respect, the statement that her self-destruction was the result of loss of her volition is a mere conclusion. It is also significant that the complaint pleads no facts with respect to Jeannie's activities or mental condition during the period from April 15 to May 27, 1958. There are no facts alleged which, if proved, would establish a cause-effect relationship between the alleged nonfeasance of the defendant and the suicide of the deceased.

In *Laidlaw v. Sage* (1899), 158 N. Y. 73, 52 N. E. 679, 688, 44 L. R. A. 216, it was said (p. 99):

" 'A proximate cause is one in which is involved the idea of necessity. . . . A remote cause is one which is inconclusive in reasoning, because from it no certain conclusion can be legitimately drawn. In other words, a remote cause is a cause the connection between which and the effect is uncertain, vague, or indeterminate. . . . The proximate cause being given, the effect must follow. . . . The remote cause being given, the effect may or may not follow.' "

At page 757, sec. 4 of the annotations referred to above, 11 A. L. R. (2d), it is further stated:

"As a general rule a person will not be relieved of liability by an intervening force which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. However, if such intervening force takes the form of suicide the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide."

Under sec. 7 of the same annotation, page 763, is cited *Stevens v. Steadman* (1913), 140 Ga. 680, 79 S. E. 564, 47 L. R. A. (N. S.) 1009, where demurrer was sustained to a complaint charging the defendant with an act deliberately designed to bring about the suicide of another. The wrongful act was the writing of a letter allegedly composed in such manner as to produce in the recipient a suicidal state of mind. The court said (pp. 685, 687):

"What is termed fact is, after all, in such cases merely a conclusion of the pleader, though it is set forth as fact and put in the place of a fact among other facts joined together in laying the foundation of the plaintiff's case. . . . Mere positiveness of the terms alleging the psychological results which we have set forth above would not prevent the court from holding, upon demurrer, that the results charged could not have been the known and natural results of the acts charged against the accused."

It is pointed out in succeeding pages, in discussing cases involving the duty owed by private hospitals to their patients, that the law does not require of anyone in the exercise of reasonable care to take measures against a danger which a patient's known mental condition does not suggest as likely to happen. The test of actionable negligence in such cases

is not what could have been done to prevent a particular accident but whether the hospital had notice of conduct or language evidencing a purpose to inflict self-injury.

The peculiar difficulty encountered in proving causation in a case of this kind is largely due to the nature of the subject matter. The fact that the deceased, before she came under the defendant's counsel, may already have been afflicted with a condition which would account for her suicide further complicates the issue. In discussing the reluctance of courts to extend any doctrine of recovery for mental distress alone to a situation where the defendant is charged with ordinary negligence, it is said in 64 A. L. R. (2d), Emotional Disturbances, p. 113, sec. 6:

"The contention that because of the nature of the evidentiary problems involved, the judicial process is not well adapted to distinguishing valid from fraudulent claims in this area, has been recognized as probably the most substantial of the reasons advanced for denying recovery for mental distress or its physical consequences."

A further difficulty is present in this case. Defendant is charged with three acts of negligence. Even assuming he had secured psychiatric treatment for Jeannie or that he had advised her parents of her emotional condition or that he had not suggested termination of the interviews—it would require speculation for a jury to conclude that under such circumstances she would not have taken her life.

*By the Court.*—Order affirmed.