PER CURIAM.
 

 Cindy Prill, as the administratrix of the estate of Michael David Prill, her deceased son, appeals from a summary judgment entered in favor of Sean Marrone (“Sean”), John Marrone (“Mr. Marrone”), and Justin R. Beams in Ms. Prill’s wrongful-death and negligent-entrustment action against them.
 

 Procedural History
 

 On July 15, 2004, Ms. Prill sued Justin, Sean, and Mr. Marrone, alleging wrongful death against Justin and Sean and negligent entrustment against Mr. Marrone. Ms. Prill also sought to hold Sean and Justin civilly liable for Michael’s death on a conspiracy theory. Mr. Marrone is Sean’s father. Sean and Mr. Marrone filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted, which the trial court denied. Separately, Justin filed a motion to dismiss for failure to state a claim upon which relief could be granted, which the trial court also denied.
 

 On August 17, 2004, Sean and Mr. Mar-rone filed their answer to Ms. Prill’s complaint, denying the material allegations of the complaint and pleading the affirmative defenses of contributory negligence and assumption of the risk. On August 2, 2005, Justin filed a motion for a summary judgment. On August 8, 2005, Sean and Mr. Marrone filed a motion for a summary judgment. On November 8, 2005, the trial court granted the motions for a summary judgment. Ms. Prill appealed.
 

 Facts
 

 This case is based on the events that led to Michael’s death from a single gunshot wound to the head, which was inflicted by a .38 Special Smith & Wesson brand handgun owned by Mr. Marrone. Michael was 20 years old at the time of his death; Sean and Justin were 17 years old.
 

 On July 21, 2002, Sean entered Mr. Mar-rone’s bedroom closet, while Mr. Marrone was asleep in the bedroom, and removed four guns, including the .38 handgun that later killed Michael and a .45-caliber Glock brand handgun, and some ammunition from a closet. Sean did not have Mr. Marrone’s permission to remove any guns from the closet. Mr. Marrone testified that neither the closet nor the guns in the closet were secured with locks.
 

 On at least one prior occasion, Sean had removed a gun from his father’s closet without permission. On that occasion, Mr. Marrone warned Sean not ever again to remove any guns from the closet, and it appears that Mr. Marrone grounded Sean for having done so on that occasion. This incident happened at least six months before the events here.
 

 Shortly after Sean removed the guns from his father’s closet, Justin arrived at Sean’s house. Sean and Justin placed the guns and ammunition in Justin’s vehicle and then drove to Michael’s mobile home to “go shooting” with him. Two days before this event, Sean, Justin, and Michael had gathered at Michael’s mobile home and shot a shotgun that belonged to Michael.
 

 Upon arriving at Michael’s mobile home, Sean placed the .38 handgun and some bullets for it in the front pocket of his pants, and Justin concealed the Glock in his hand. They knocked on the front door of the mobile home at around 3:30 p.m., and Ms. Prill allowed Sean and Justin to
 
 *4
 
 enter the mobile home. Ms. Prill did not know that they brought guns into her house until after the shooting. Also present in the mobile home were Michael and Ms. Prill’s boyfriend, Lance Smelley. Smelley was asleep in the master bedroom when Sean and Justin arrived.
 

 After Sean and Justin woke Michael from a nap, Sean, Justin, and Michael went into the dining room of the mobile home and played a game with the .38 handgun, which was unloaded. The game consisted of each of the boys taking turns placing the gun in his “wallet” and then pulling the gun out of his wallet and acting like he was robbing a store. Ms. Prill, who was in another room, asked the boys to quiet down. The boys then returned to Michael’s bedroom.
 

 After returning to Michael’s bedroom, all three boys took turns handling the .38 handgun. Each boy would take a turn putting a bullet into one chamber of the handgun, spin the cylinder, and close the cylinder to see where the bullet had landed. These actions were meant to imitate Russian roulette, but the boys did not point the .38 handgun at anyone, including themselves.
 

 At some point, Sean began loading bullets into all but one of the chambers of the .38 handgun and spinning the cylinder to see where the empty chamber would land. While Sean was doing this, Ms. Prill knocked on the bedroom door. Before Ms. Prill entered the bedroom, Sean laid the loaded gun beside Michael, who was lying on his bed. Ms. Prill stuck her head in the bedroom door and asked Michael if he had a piece of paper with a neighbor’s telephone number on it. Michael responded that he did not have the piece of paper, so Ms. Prill left the room. According to Sean, shortly after Ms. Prill left the room, Michael, who was left-handed, picked up the .38 handgun with his right hand
 
 [1]
 
 and said, “[L]et’s play Russian roulette.” Michael immediately pointed the gun at his head and pulled the trigger. The gun fired once, and a bullet struck Michael in his right temple, killing him.
 

 Justin testified that he was walking out of the bedroom door when the gun was fired. Justin said that he turned around and saw Sean standing near the foot of the bed where he had been sitting moments before. Ms. Prill testified that only 15 or 20 seconds elapsed from the time she left Michael’s bedroom until she heard the shot. Ms. Prill further testified that it did not occur to her that anything odd or unusual was going on in the bedroom when she spoke to Michael. Justin and Sean agreed that Michael did not know that the gun was loaded before he picked it up, placed it to the right side of his head, and pulled the trigger.
 

 Dr. William Shores, a forensic pathologist for the Alabama Department of Forensic Sciences, performed an autopsy on Michael. Dr. Shores testified that he could not determine whether the gun was fired by Michael or by someone else.
 

 Justin testified that Michael had said that he had played Russian roulette before, but Justin did not believe him. According to Justin, Michael was reckless and seemed always to be depressed. Justin further testified that Michael had wrecked his sister’s automobile because he was upset and he said that he had wanted to kill himself. Sean testified that, at some time before the day Michael died,
 
 *5
 
 Sean had asked Michael if he would ever play Russian roulette and he responded that he would play.
 

 Ms. Prill acknowledged that she did not have any personal knowledge that either Sean or Justin had handled the gun that caused Michael’s death or that either Sean or Justin had coerced or tricked Michael into handling the gun or pulling the trigger himself. Ms. Prill testified that she had no knowledge, personal or otherwise, as to who actually pulled the trigger.
 

 Ms. Prill described Michael as a kindhearted, fun-loving person, who loved to make people smile. Ms. Prill testified that Michael was “doing okay” psychologically around the time of the shooting, that he had never had any psychological treatment or counseling, and that she had never known him to express any suicidal thoughts or to have any suicidal tendencies. Ms. Prill further testified that Michael had gone through “some typical teenage stuff with girls breaking up with him” but nothing that caused her great concern. Ms. Prill indicated that Michael was very responsible with guns, and she testified that he had taken a hunter’s safety course.
 

 Standard of Review
 

 “This Court’s review of a summary judgment is de novo.
 

 “ ‘In reviewing the disposition of a motion for summary judgment, “we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,”
 
 Bussey v. John Deere Co.,
 
 581 So.2d 860, 862 (Ala.1988), and whether the movant was “entitled to a judgment as a matter of law.”
 
 Wright v. Wright,
 
 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue.
 
 Bass v. SouthTrust Bank of Baldwin County,
 
 538 So.2d 794, 797-98 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 Wright,
 
 654 So.2d at 543 (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant.
 
 Wilma Corp. v. Fleming Foods of Alabama, Inc.,
 
 613 So.2d 359 (Ala.1993) [overruled on other grounds,
 
 Bruce v. Cole,
 
 854 So.2d 47 (Ala.2003) ];
 
 Hammers v. Balfour Guthrie, Inc.,
 
 564 So.2d 412, 413 (Ala.1990).’ ”
 

 Pittman v. United Toll Sys., LLC,
 
 882 So.2d 842, 844 (Ala.2003) (quoting
 
 Hobson v. American Cast Iron Pipe Co.,
 
 690 So.2d 341, 344 (Ala.1997)).
 

 Issues and Analysis
 

 First, Ms. Prill asserts that she presented substantial evidence indicating that Justin’s and Sean’s negligence caused Michael’s death. Specifically, Ms. Prill alleges that Sean and/or Justin negligently concealed handguns on their person and brought the guns into her house, in violation of § 13A-11-73, Ala.Code 1975, and that they negligently handled the guns. In their motions for a summary judgment, Justin, Sean, and Mr. Marrone argued that, as a matter of law, Justin’s and Sean’s allegedly negligent conduct was not the proximate cause of Michael’s death because, they said, Michael’s unforeseen
 
 *6
 
 actions intervened and were the superseding cause of the injury.
 

 “The elements of a negligence claim are a duty, a breach of that duty, causation, and damage.”
 
 Armstrong Bus. Servs., Inc. v. AmSouth Bank,
 
 817 So.2d 665, 679 (Ala.2001). “It is settled law in Alabama that even if one negligently creates a dangerous condition, he or she is not responsible for injury that results from the intervention of another cause, if at the time of the original negligence, the intervening cause cannot reasonably be foreseen.”
 
 Sims v. Crates,
 
 789 So.2d 220, 224 (Ala.2000) (citing
 
 Gilmore v. Shell Oil Co.,
 
 613 So.2d 1272 (Ala.1993)). “In such cases, we have held that the defendant’s negligence is not the ‘proximate cause’ of the plaintiffs injury, and, therefore, that the defendant is not liable.”
 
 Gilmore,
 
 613 So.2d at 1275. “Such an unforeseen agency, which breaks the chain of causation that otherwise might have linked the defendant’s negligence to the plaintiffs injury, has been referred to as an ‘intervening efficient cause.’ ”
 
 Id.
 
 “In order for conduct to be considered an intervening efficient cause, it must (1) occur after the defendant’s negligent act, (2) be unforeseeable to the defendant at the time he acts, and (3) be sufficient to be the sole cause-in-fact of the plaintiffs injury.”
 
 Id.
 

 “In
 
 Gilmore,
 
 an employee at a gasoline station/convenience store kept a loaded handgun on a shelf beneath the counter in the store. The plaintiffs son, Michael Gilmore, was a friend of another employee. On the day he died, Michael had gone to the store to visit his friend. The employee who owned the handgun testified that on that day, he had inadvertently left the handgun on the shelf beneath the counter. Michael went behind the counter to make a telephone call; while there, he took the handgun from underneath the counter. His friend testified that Michael ‘opened the chamber of the handgun and removed all the bullets. Michael then replaced one of the bullets, closed the chamber, put the handgun to his head, and pulled the trigger.’ 613 So.2d at 1274. The shot killed Michael. This Court held that his conduct was an efficient intervening cause that negated any liability of the defendants for any negligence on their part in leaving the handgun on the shelf.
 

 “ ‘The death of Michael Gilmore is also an unexplainable tragedy. We do not understand, nor do we attempt to rationalize, his deliberate and destructive final act. However, we recognize that such acts are not the ordinary and naturally flowing consequences of the defendants’ negligent conduct in leaving the handgun under the cashier’s counter where it was accessible to those persons who might find themselves behind the cashier’s counter. What relieves the defendants of any liability for Michael’s death is that Michael, by his own hands, acted intentionally and deliberately in a manner that was calculated to result in his own death.’
 

 “[613 So.2d] at 1278.”
 

 Sims,
 
 789 So.2d at 224-25.
 

 In
 
 Sims,
 
 the father of a teenager who shot himself while attending a party at the home of a friend’s stepfather brought a wrongful-death action against the stepfather and the friend, alleging that the teenager’s death was the proximate result of negligent, willful, or wanton acts on their part. The stepfather kept handguns in his bedroom in an unlocked cabinet that was built into the headboard of his bed. However, all the handguns were stored unloaded, and the ammunition was kept in a separate locked cabinet. The teenager obtained a .357 handgun from the cabinet, but he obtained ammunition for the hand
 
 *7
 
 gun from another teenager who attended the party and not from the stepfather’s locked cabinet. The teenager was taking cartridges in and out of the chamber of the handgun and spinning the chamber around. Some girls told him to stop playing with the gun. The teenager stated that he could not die, put the gun to his head, and pulled the trigger, but nothing happened. One of the girls left to get someone who would take the gun away from the teenager, but while she was gone he again put the gun to his head and pulled the trigger. The gun discharged, killing the teenager.
 
 Sims,
 
 789 So.2d at 222-23. This Court held that the teenager’s own actions were sufficient to break any chain of causation between the stepfather’s actions and the teenager’s death. 789 So.2d at 224.
 

 Likewise, in the present case, Michael’s own negligent and unforeseeable actions were sufficient to break any chain of causation between Justin’s and Sean’s actions and Michael’s death. Michael intentionally and suddenly picked up the .38 handgun, pointed it at his head, and pulled the trigger. There is no evidence indicating that Justin or Sean coerced or tricked Michael into handling the gun or pulling the trigger or that they could foresee that Michael was about to take these actions. At the time of the shooting, the three friends had been playing for approximately an hour without incident, there had been no discussion of suicide, and they had not actually played Russian roulette or pointed the gun at anyone or at themselves. Justin and Michael had simply gathered at Michael’s house to “go shooting” with him, as they had done two days earlier.
 

 Furthermore, the fact that Michael may not have known that the gun was loaded is irrelevant. Ms. Prill testified that Michael, who was 20 years old, had taken a hunter’s safety course, and there was evidence indicating that Michael had some familiarity with guns. As the United States Court of Appeals for the Sixth Circuit has stated: “Any gun safety course teaches and any reasonable gun user should know that no gun, loaded or unloaded, should ever be pointed at [a] human, much less pointed and mockingly fired.”
 
 Davis v. McCourt,
 
 226 F.3d 506, 512 (6th Cir.2000). Therefore, even if Sean and/or Justin negligently created a dangerous condition with their actions, they are not responsible for Michael’s death, which resulted from the intervention of his unforeseeable conduct. Michael’s actions were unforeseeable as a matter of law and were the proximate cause of his death.
 

 Ms. Prill next argues, as an exception to the general rule that suicide is an intervening cause that serves to break all causal connections between the alleged negligent acts and the death, that, assuming Michael committed suicide, Justin and Sean “created an uncontrollable impulse in Michael which led to suicide or caused a mental condition which resulted in his suicide.” (Ms. Prill’s brief, at 30.) In
 
 Vinson v. Clarke County, Alabama,
 
 10 F.Supp.2d 1282, 1303-04 (S.D.Ala.1998), the court stated:
 

 “Under Alabama law, suicide generally functions as an efficient intervening cause which serves to break all causal connections between the alleged wrongful or negligent acts and the death at issue. See
 
 Gilmore v. Shell Oil Co.,
 
 613 So.2d 1272, 1275-76 (Ala.1993). Consequently, a defendant cannot be found liable for the suicide of another unless ‘the relationship between a decedent and a defendant is such that we expect the defendant to take reasonable steps to protect the decedent from deliberate and self-destructive injury.’
 
 Id.
 
 at 1278.”
 

 
 *8
 
 Furthermore, the court noted that “the Alabama Supreme Court has indicated that liability for suicide might result in one other circumstance, namely where a defendant created an uncontrollable impulse in another which led to suicide, see
 
 Gilmore,
 
 613 So.2d at 1276 .... ”
 
 Vinson,
 
 10 F.Supp.2d at 1304. Finally, the court recognized that “[w]here there is neither a custodial relationship which would indicate the foreseeability of suicide, or a claim of irresistible impulse, Alabama law provides that ‘suicide ... is unforeseeable as a matter of law, and civil liability will not be imposed upon a defendant for a decedent’s suicide.’ ” 10 F.Supp.2d at 1304 n. 21 (quoting
 
 Gilmore,
 
 613 So.2d at 1278).
 

 This Court has not elaborated on what type of conduct by a defendant might cause a victim to experience an “uncontrollable impulse,” so that the act of suicide is considered to be the last link in the chain of causation from the defendant’s alleged wrongful act to the suicide and, thus, the defendant’s act is the proximate cause of death. However, other jurisdictions have explained that an “uncontrollable impulse” consists of “a delirium, frenzy or rage, during which the deceased commits suicide ‘without conscious volition to produce death.’ ”
 
 McMahon v. St. Croix Falls School Dist.,
 
 228 Wis.2d 215, 225, 596 N.W.2d 875, 880 (Wis.Ct.App.1999) (quoting
 
 Bogust v. Iverson,
 
 10 Wis.2d 129, 138, 102 N.W.2d 228, 232 (1960)); see also
 
 Restatement (Second) of Torts
 
 § 455 (1965) (actor liable if actor’s negligent conduct causes another’s insanity, making it impossible for the other to resist an impulse caused by her insanity). The key to finding an “uncontrollable impulse” is finding that “the defendant actually causes the suicide.”
 
 McMahon,
 
 228 Wis.2d at 225, 596 N.W.2d at 880.
 

 In the present case, Ms. Prill has not presented any evidence indicating that Justin or Sean caused Michael to enter a “delirium, frenzy or rage” during which he committed suicide. In fact, Ms. Prill did not present any expert or circumstantial evidence of Michael’s state of mind at the moment he shot himself. Ms. Prill testified that she talked to Michael seconds before he shot himself and that at that time it did not occur to her that anything odd or unusual was going on. There is no evidence indicating that Justin’s or Sean’s conduct caused Michael to surrender his own free will. All the evidence presented to the trial court leads to the conclusion that, with conscious volition, Michael recklessly and without warning picked up the gun, pointed it at his head, and pulled the trigger. Ms. Prill failed to present substantial evidence indicating that Justin and/or Sean created an uncontrollable impulse in Michael that led to his suicide. Therefore, Ms. Prill has failed to present substantial evidence creating a genuine issue of material fact in response to the properly supported summary-judgment motions, and, thus, the summary judgment in favor of Justin and Sean on her wrongful-death claim is affirmed.
 

 Next, Ms. Prill alleges that she presented substantial evidence to support her claim of negligent entrustment against Mr. Marrone. “ ‘The essential ingredients of a cause of action for negligent entrustment are: (1) an entrustment; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) proximate cause; and (5) damages.’ ”
 
 Halford v. Alamo Rent-A-Car, LLC,
 
 921 So.2d 409, 412 (Ala.2005) (quoting
 
 Mason v. New,
 
 475 So.2d 854, 856 (Ala.1985) (emphasis omitted)). Mr. Mar-rone responds that he is not liable under the theory of negligent entrustment because, he says, he did not entrust the .38 handgun to Sean.
 

 This Court has not specifically defined the element of entrustment in the context
 
 *9
 
 of a claim that alleges the negligent en-trustment of a gun. However, in
 
 Edwards v. Valentine,
 
 926 So.2d 815 (Ala.2005), this Court discussed the element of entrustment in the context of a claim alleging the negligent entrustment of an automobile:
 

 “ ‘In Alabama, when one person drives a car belonging to another, a rebuttable
 
 presumption of entrustment, ie.,
 
 that the car was being operated by the driver with the permission of the owner, arises when ownership is established .... Thus, the owner of a vehicle is faced with a substantial burden in order to disprove an entrustment.’ Note,
 
 Negligent Entrustment in Alabama,
 
 23 Ala. L.Rev. 733, 738 (Summer 1971) (emphasis added; footnote omitted); see also
 
 Thompson v. Havard,
 
 285 Ala. 718, 721, 235 So.2d 853, 856 (1970). ‘Entrustment can include either [1] actual entrustment, [2] continuing consent to use the vehicle, or [3] leaving the vehicle available for use.’ Note, supra, at 738. A case of entrustment by ‘leaving the vehicle available’ may occur, even though ‘the entrustor has not given ... permission [to use the vehicle on a particular occasion]
 
 and may even have expressly refused it’ Id.
 
 at 739 (emphasis added; footnote omitted). ‘In order to establish that there has been an entrustment by leaving the vehicle available, it must be shown that the entrustor knew or had reason to know that the particular incompetent involved in the accident
 
 was likely to use the vehicle without authorization
 
 and that the entrustor
 
 failed to take reasonable precautions to prevent such unauthorized use.’ Id.
 
 (emphasis added; footnote omitted); see also
 
 Redmond v. Self,
 
 265 Ala. 155, 90 So.2d 238 (1956);
 
 Paschall v. Sharp,
 
 215 Ala. 304, 110 So. 387 (1926). In this case, the evidence was sufficient for the court to conclude that Edwards left the vehicle available for Garrison’s use on the date of the accident.”
 

 Edwards,
 
 926 So.2d at 320-21.
 

 In
 
 Edwards,
 
 a motorist was struck from behind by a pickup truck while it was being operated by the brother-in-law of the owner of the truck. The motorist and his wife sued the owner, asserting a claim of negligent entrustment of a vehicle. Following a nonjury trial, the trial court awarded the motorist $115,000 in compensatory damages and awarded the motorist’s wife $35,000 on her loss-of-consortium claim.
 
 Edwards,
 
 926 So.2d at 319.
 

 At the time of the accident in
 
 Edwards,
 
 the owner and the brother-in-law had lived in adjacent mobile homes for approximately 10 years. The owner testified that he “left” his truck for his brother-in-law’s wife, who was the owner’s sister and had four small children, to use “in case of an emergency.” 926 So.2d at 321. The brother-in-law testified that he took the truck on the day of the accident to go to the store. The keys were not in the truck, so the brother-in-law entered the owner’s home and got the keys from the dresser or the table, as he had occasionally done in the past. The parties stipulated to the admission of the deposition of Billy Ray Cochran, who testified that he had seen the brother-in-law driving the owner’s truck on occasions before the accident. He also stated that, on numerous occasions — both before and after the accident — he had seen the owner give the brother-in-law the keys to the owner’s truck, accompanied by the instructions that if the brother-in-law, his wife, or one of their children ever had a wreck in it, they should claim that they had stolen the truck.
 
 Edwards,
 
 926 So.2d at 321.
 

 Based on these facts, this Court held that “the evidence was sufficient for the court to conclude that [the owner] left the vehicle available for [the brother-in-law]’s
 
 *10
 
 use on the date of the accident.”
 
 Edwards,
 
 926 So.2d at 321. Furthermore, “[t]he trial court’s conclusion that [the owner] entrusted his vehicle to [the brother-in-law] is not palpably erroneous.”
 
 Id.
 
 But see
 
 Penland v. Allsup,
 
 527 So.2d 715 (Ala.1988) (holding that the owner of a sports car, who had been drinking with the passenger and who had left the keys in the car so the passenger could listen to the radio while the owner got out of the car for a brief delivery, did not entrust the car to the passenger and was not liable for negligent entrustment, even though the passenger had used the car on three prior occasions; the passenger had always used the car with the owner’s express permission, had not previously used the car at will, and was not drunk on previous occasions).
 

 Also, in the context of construing a provision in an insurance policy that excluded coverage for property entrusted to an insured for storage or safekeeping, this Court quoted with approval the following language: “‘The word entrust has been defined by both lay and legal authorities in substance to mean to commit something to another with a certain confidence regarding his care, use or disposal of it.’ ”
 
 Ho Bros. Rest., Inc. v. Aetna Cas. & Sur. Co.,
 
 492 So.2d 603, 606 (Ala.1986) (quoting
 
 Pacific Indem. Co. v. Harrison,
 
 277 S.W.2d 256, 261 (Tex.Civ.App.1955) (emphasis omitted)). This Court also noted that “[u]nder
 
 Pacific Indemnity Co.,
 
 supra, and its progeny, in order for there to be an ‘entrustment’ of an automobile, there basically has to be a voluntary and actual delivery of keys and/or the vehicle to the thief by the insured.”
 
 Ho Bros. Rest.,
 
 492 So.2d at 606. Furthermore, this Court held:
 

 “We hereby adopt the
 
 Pacific Indemnity Co., supra,
 
 construction of ‘entrustment’ as the construction which ordinary men would place on the word ‘entrustment.’ Implicit in this holding is the requirement of some expectation on the part of each party as to how each will act with respect to the ‘entrusted’ property.”
 

 492 So.2d at 606.
 

 In the present case it is undisputed that, unlike the owner of the automobile in
 
 Edwards,
 
 Mr. Marrone never gave Sean express or implied permission to remove the .38 handgun from the bedroom closet. In fact, Mr. Marrone explicitly told Sean
 
 not
 
 to remove the gun from the closet. As was the case with the owner of the vehicle in
 
 Penland,
 
 there is no evidence indicating that Mr. Marrone ever intended for Sean to use the .38 handgun on the day that Michael died. Mr. Marrone did not have any expectation as to how Sean would handle the gun if he removed it from the closet because Mr. Marrone did not have any expectation that the gun would be removed from the closet. Mr. Marrone did not actively aid, assist, or facilitate Sean’s removal of the gun from the closet. Ms. Prill did not present substantial evidence indicating that Mr. Marrone knew that Sean was likely to use the .38 handgun without authorization and that Mr. Marrone failed to take reasonable precautions to prevent such unauthorized use. It is undisputed that Mr. Marrone stored the unloaded guns in a closet in his bedroom and explicitly told Sean not to remove the guns. The fact that, at least six months before Michael’s death, Sean had removed a gun from Mr. Marrone’s closet without his permission is not substantial evidence indicating that Mr. Marrone entrusted the .38 handgun to Sean on the day Michael died.
 

 Moreover, even assuming that Mr. Marrone did negligently entrust the .38 handgun to Sean, Mr. Marrone’s negligence was not the proximate cause of Michael’s death. As discussed earlier, Mi
 
 *11
 
 chael’s own negligence was a superseding intervening cause that attenuated any negligence on the part of Mr. Marrone from the ultimate injury to Michael. Therefore, Ms. Prill did not present substantial evidence to support her negligent-entrustment claim.
 

 Finally, Ms. Prill appears to seek civil liability for certain criminal acts allegedly committed by Justin and Sean. Specifically, Ms. Prill alleges that “since suicide is a felony at common law, if [Justin] or Sean either induced or caused, aided or abetted, or failed to prevent [Michael] from committing suicide, both are criminally liable for his death.” (Ms. Prill’s brief, at 20.) To support this allegation, Ms. Prill cites § 13A-2-23, Ala.Code 1975, which sets forth criminal liability based upon the behavior of another. Ms. Prill also alleges that “[s]ince suicide is murder at common law, an agreement encompassing it is criminal conspiracy.” (Ms. Prill’s brief, at 21.) Ms. Prill does not elaborate on either of these allegations, and it is unclear how they relate to the summary judgment. In her complaint, Ms. Prill did allege that “[Sean] and [Justin] were co-conspirators and entered the home of [Michael] with concealed weapons knowing that if weapons had been shown when [Sean and Justin] entered the home of [Michael], they would have been denied entry into the home.” However, Ms. Prill scarcely mentions the conspiracy claim in her responses to the summary-judgment motions or in her briefs to this Court.
 

 In
 
 Martinson v. Cagle,
 
 454 So.2d 1383 (Ala.1984), this Court held that, although an act that constitutes a crime can also be the basis of a civil action, civil liability will exist “only if the acts complained of violate the legal rights of the plaintiff, constitute a breach of duty owed to the plaintiff, or constitute some cause of action for which relief may be granted.” 454 So.2d at 1385. This Court found that counts alleging “only that the criminal acts were committed and that the [plaintiffs] were thereby injured” did not state a civil cause of action.
 
 Id.
 

 Like the plaintiff in
 
 Martinson,
 
 Ms. Prill alleges only that Justin and Sean committed criminal acts and that those acts caused injury to Michael. The language of the Alabama Code does not create a private right of action for criminal complicity or criminal conspiracy, nor does Ms. Prill show where this Court has recognized that a civil cause of action exists under the criminal statutes proscribing this conduct. To the extent that the allegedly criminal conduct of Justin or Sean also constitutes a legitimate civil cause of action, such as a cause of action for negligence, that claim has been pursued. However, Ms. Prill may not maintain a separate or additional cause of action under the criminal-complicity or conspiracy statutes. Therefore, the motions for a summary judgment were properly granted as to these allegations of criminal conduct.
 

 To the extent that Ms. Prill’s conspiracy claim may be construed as a civil-conspiracy claim, she has not presented substantial evidence to support such a claim. “A plaintiff alleging a conspiracy must have a valid underlying cause of action.” Callens v. Jefferson County Nursing Home, 769 So.2d 273, 280 (Ala.2000). As discussed earlier, Ms. Prill’s wrongful-death claim fails because she cannot prove causation. Therefore, she does not have a valid underlying cause of action to support her conspiracy claim. tion.”
 
 Callens v. Jefferson County Nursing Home,
 
 769 So.2d 273, 280 (Ala.2000). As discussed earlier, Ms. Prill’s wrongful-death claim fails because she cannot prove causation. Therefore, she does not have a valid underlying cause of action to support her conspiracy claim.
 

 It should also be noted that it is unnecessary to address the arguments set forth by the parties concerning the affirmative defenses of assumption of the risk and contributory negligence. A summary judgment is proper for the defendants in this case on the wrongful-death claim be
 
 *12
 
 cause Michael’s conduct broke the chain of causation that otherwise might have linked the defendants’ negligence to the plaintiffs injury. The conduct of Justin and Sean was simply not the proximate cause of Michael’s death. A summary judgment is likewise proper for Mr. Marrone on the negligent-entrustment claim.
 

 Conclusion
 

 Based on the foregoing, the trial court’s judgment is affirmed.
 

 AFFIRMED.
 

 COBB, C.J., and WOODALL, SMITH, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . Ms. Prill testified that Michael was left-handed and that he was uncoordinated using his right hand but no more so than a typical left-handed person would be. Ms. Prill acknowledged that Michael had broken his left hand in October 2001 and that he was required to use his right hand more while his left hand was in a cast.