903 P.2d 73

James and Diane BROOKS, individually, and as guardians ad litem for their minor daughter, Amber Dianne Brooks, heirs at law, and as the Personal Representatives for the estate of their minor child, Jeffrey M. Brooks, Plaintiffs–Appellants,

v.

Laura LOGAN, individually, and as an employee of Joint School District No. 2, and Joint School District No. 2, an independent political subdivision of the state of Idaho, Defendants–Respondents.

No. 21013.

Supreme Court of Idaho, Boise, January 1995 Term.

Aug. 30, 1995.

Rehearing Denied Oct. 17, 1995.

Law Offices of Comstock & Bush, Boise, for appellants. John A. Bush, argued.

Quane, Smith, Howard & Hull, Boise, for respondents. Brian Julian, argued.

TROUT, Justice.

This is a wrongful death action and an action for negligent infliction of emotional distress arising from the suicide of fourteen-year-old Jeffrey Brooks.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

In this case, Jeffrey Brooks (Jeff), who was a student at Meridian High School, was asked by his English teacher, respondent Laura Logan (Logan), to make entries into a daily journal as part of an English composition assignment. He did this beginning in September of 1990, and continued on to the end of December, 1990. The following January he committed suicide at his home.

After Jeff's suicide, Logan read through his entries in the journal and then turned it over to a counselor who subsequently delivered it to Jeff's parents, James and Diane Brooks (the Brooks). The Brooks then called Logan, and according to them she indicated that she had "re-read" the journal provisions and decided that the Brooks should have it. When the composition project began, Logan advised the students that she would be reading their journals; however, after a few months Jeff expressed concerns that he could not fully express himself knowing that Logan would read his entries. Thereafter Jeff's journal contains a passage written by Logan in which she indicated that she would not read the journal for content, but would instead check the entries for dates and length. In her affidavit, Logan claims she never read Jeff's journal after advising him that she would not. She, therefore, disputes the Brooks' assertion that she "re-read" Jeff's journal after his death. To the contrary, she maintains that she read the journal entries for the first time only after Jeff's death. Jeff's journal contains some passages in which he alludes to death or depression, but there is no definite statement that he was contemplating suicide.

The Brooks brought suit against Logan and the Meridian School District (the District) and have alleged that the District has a duty regarding the investigation and training

of qualified teachers, and a duty to take affirmative action to detect and assist students who suffer from depression or suicidal ideation. In addition the Brooks allege that the District and Logan jointly have a duty to seek help for a student who displays suicidal tendencies at school.

Logan and the District filed a motion for summary judgment seeking to dismiss the Brooks' claims on the grounds that there are no facts in dispute; no duty was owed by Logan and the District to Jeff; Jeff's act of committing suicide was not foreseeable; and the District is immune from liability under I.C. § 6–904. The trial court granted Logan and the District's motion, finding that they did not owe a duty of care to Jeff, and that they were immune from liability for failing to implement a suicide prevention program. Because there was at least a factual question about whether Logan had indeed read the entire journal, the judge concluded that for the purposes of the summary judgment motion he would deem that she had read the journal. In spite of that, the court still concluded that Logan had no responsibility to take action. The case is now before us on appeal from the grant of summary judgment.

## II.

### IMMUNITY UNDER THE IDAHO TORT CLAIMS ACT

This issue requires an analysis of the Brooks' complaint under two separate sections.

#### A. Suicide Prevention Program

First, we address the allegations that the District had a duty to:

1) investigate and hire well-trained and qualified teachers;

2) adequately train all faculty members in the means and detection, recognition, and prevention of potentially suicidal behavior exhibited by any student;

3) take affirmative steps to detect and assist its students suffering from disabilities such as severe depression or suicidal ideation.

The District argues that based upon the Idaho Tort Claims Act (ITCA), it is immune from liability stemming from any alleged failure to perform the above duties.

 Review of any order granting summary judgment requires us to make two determinations: (1) whether there remains a genuine issue as to any material fact; and (2) whether the non-moving party is entitled to judgment as a matter of law. *Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 299, 796 P.2d 506, 508 (1990) (citing *Mitchell v. Siqueiros*, 99 Idaho 396, 582 P.2d 1074 (1978)). In making those determinations, the Court will construe the facts and any reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* (citing *Anderson v. City of Pocatello*, 112 Idaho 176, 731 P.2d 171 (1986); *Hirst v. Saint Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440 (Ct.App.1984)).

In *Czaplicki v. Gooding Joint Sch. Dist. No. 231*, 116 Idaho 326, 775 P.2d 640 (1989), we stated that:

> In ruling on a motion for summary judgment based upon an immunity defense under the Idaho Tort Claims Act (ITCA), a trial judge should first determine whether the plaintiffs' allegations and supporting record generally state a cause of action for which "a private person or entity would be liable for money damages under the laws of the state of Idaho." *Walker v. Shoshone County*, 112 Idaho 991, 995, 739 P.2d 290, 294 (1987). The court must then determine whether an exception to liability under the ITCA shields the alleged misconduct from liability. In consideration of the initial inquiry as to whether a private individual or entity could be held liable under the facts alleged in the complaint, we essentially ask "is there such a tort under the laws of Idaho?" [*Id.*]

*Czaplicki* at 330, 775 P.2d at 644. We find that the Brooks' allegations and supporting record generally state a cause of action for which a private person or entity would be liable for money damages under the laws of the state of Idaho: that is, the tort of negligence.

The next stage in the analytical process applicable to such a motion requires us to

evaluate the availability of an exception to liability under the ITCA. The ITCA subjects the state and its political subdivisions to liability for its negligent acts or omissions. *Ransom v. City of Garden City*, 113 Idaho 202, 204, 743 P.2d 70, 72 (1987) (citing I.C. § 6–903). The discretionary function exception upon which the District relies states:

> **Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
>
> 1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

I.C. § 6–904(1).

■ The test for determining the applicability of discretionary function immunity looks at the nature of the conduct. Routine matters not requiring evaluation of broad policy factors will likely be "operational," whereas decisions involving a consideration of the financial, political, economic, and social effects of a particular plan are likely "discretionary" and will be accorded immunity. *Lawton v. City of Pocatello*, 126 Idaho 454, 460, 886 P.2d 330, 336 (1994) (citing *Ransom v. City of Garden City*, 113 Idaho 202, 205, 743 P.2d 70, 73 (1987)). We then evaluate the challenged conduct in light of the dual policies advanced by the discretionary function exception: to permit those who govern to do so without being unduly inhibited by the threat of liability and to limit judicial second-guessing of basic policy decisions entrusted to other branches of government.

■ Applying this analysis to this case, it appears clear that the decision to implement a suicide prevention program, including training teachers in the district, is a discretionary function. The decision to implement a suicide prevention program should be left

to the decision-making body, in this case the legislature or the District, through public input and discussion. The courts do not have the fact-finding ability of the legislature or executive departments and should not attempt to balance the detailed and competing elements of legislative or executive decisions. *See Ransom v. Garden City*, 113 Idaho 202, 205, 743 P.2d 70, 73 (1987) (citations omitted). Making a determination that our local schools should be at the forefront of the prevention effort is unquestionably an important public policy issue which must be left to the sound discretion of the District. Thus, we hold that the District is immune from liability based upon the discretionary function exception for any failure to implement a suicide prevention program, or train its staff in such prevention.

## B. Failure to Warn

■ The Brooks also allege that the District and Logan in her capacity as a District employee have a duty to alert and/or warn the parents and family of a student and/or the school authorities of all suicidal tendencies exhibited at school. In essence, the Brooks have alleged that Logan had a duty to seek help for Jeff in light of his suicidal thoughts. In applying the test for determining the applicability of discretionary function immunity, we have determined that routine, everyday matters not requiring evaluation of broad policy factors will likely be "operational", and thus are not immune from liability. *Ransom v. City of Garden City*, 113 Idaho 202, 205, 743 P.2d 70, 73 (1987). Here, Logan's alleged failure to warn the Brooks or school authorities about the journal entries, is a decision made solely by the teacher and does not require an evaluation of financial, political, economic and social effects. While it is hopefully not a routine, everyday decision, it nevertheless involves the exercise of practical judgment and not planning or policy formation. Thus, the activity appears to be "operational".

■ Next, we consider whether the school districts or teachers will be unduly inhibited in carrying out their jobs when there is a threat of liability for using less than ordinary

care. *Ransom,* 113 Idaho at 205, 743 P.2d at 73. In *Ransom,* we noted that the legislature has provided that the defense of public employees shall be undertaken by the governmental entity if the challenged act or omission of the employee is within the course and scope of employment and does not involve malice or criminal intent. *Id.,* citing I.C. § 6–903(c). So long as these factors are met, the governmental entity is not entitled to any contribution, indemnification, or reimbursement incurred in the defense of the employee. *Id.* (citing I.C. § 6–903(d)). Finally, I.C. § 6–903(e) creates a rebuttable presumption that any act or omission of an employee within the time and place of his employment is within the scope of his employment and without malice or criminal intent. *Id.* We believe that these legislative provisions should alleviate any fears by teachers that they might be held personally liable for failing to seek help for a potentially suicidal student. *Id.*

The decision to seek help for a student with known suicidal thoughts does not involve a basic policy decision, rather it is a decision made as a result of a teacher's knowledge and in the course of that teacher's employment. Accordingly, we hold that any duty to seek assistance does not fall within the discretionary function exception of I.C. § 6–904(1). Since the discretionary function exception does not apply, Logan and the District may be liable if we find the existence of a legal duty.

## III.

## EXISTENCE OF A DUTY

■ The elements of common law negligence include (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage. *Alegria v. Payonk,* 101 Idaho 617, 619, 619 P.2d 135, 137 (1980) (citing *Brizendine v. Nampa Meridian Irrigation Dist.,* 97 Idaho 580, 548 P.2d 80 (1976)). Thus an analysis of the propriety of a summary judgment for a negligence cause of action must necessarily begin with an evaluation of duty.

### A. Assumed Duty

■ The Brooks argue that the trial court was incorrect in determining that Logan and the District did not assume a duty in this case. They argue Logan's deposition and that of the Meridian principal acknowledge the existence of an assumed duty. They claim this duty arose out of Logan's actions of helping troubled students in the past.

"A claim for breach of an assumed duty is a negligence action where the duty of care results from a voluntary undertaking." *Jones v. Runft, Leroy, Coffin & Matthews,* 125 Idaho 607, 611, 873 P.2d 861, 865 (1994) (citing *Bowling v. Jack B. Parson Companies,* 117 Idaho 1030, 793 P.2d 703 (1990)). This voluntary duty is distinct from any other duty the party may have as a result of another undertaking or relationship. *Id.* at 611–12, 873 P.2d at 865–66.

When alleging an assumed duty, plaintiff must prove that the defendant volunteered to help the plaintiff and then failed to exercise due care. That allegation is missing in this case. Nothing in the record supports a finding that Logan volunteered to help Jeff and thus assumed a duty of care for him. Quite the opposite, the evidence in the record indicates that Logan never approached Jeff regarding his journal entries, and at least advised Jeff that she would not read the entries. Further, the record does not reflect that Logan ever volunteered to assist Jeff with his alleged personal turmoil or depression. Based upon the record below, the trial court correctly found that Logan's occasional past actions of helping troubled students did not result in her assuming a duty in this case.

### B. Custodial Relationship

■ The trial court held there is no common law duty to prevent suicide absent a "custodial relationship" between the District and Jeff. Logan and the District point out that other courts have not imposed this duty to prevent suicide absent a custodial relationship and thus there can be no duty established in this case. Indeed, the cases cited

by the Brooks involve situations where the defendant had a custodial relationship over the plaintiff. The courts have held that when a person is being detained in a hospital or jail, and that person then commits suicide, the institution may be liable if the suicide was foreseeable. *See Murdock v. City of Keene*, 137 N.H. 70, 623 A.2d 755 (1993). We are not presented with that situation here. The negligence relied on in this action is a failure to communicate to the parents or school authorities information allegedly possessed by the teacher concerning the child's contemplated suicide, not a failure by the school authorities to physically prevent the suicide by exercising control over Jeff. Accordingly, we do not find that a duty predicated on a custodial relationship arises in this case.

## C. Statutory Duty

■ Next, the Brooks contend that the Idaho Code creates a duty to protect the health and morals of students, and further that this duty extends to the prevention of suicide by a student at his home. The Brooks first argue that I.C. § 33–202, which requires children between the ages of seven and sixteen to be instructed in subjects commonly and usually taught in public schools in Idaho, gives rise to a "special relationship." They argue that this statute creates a special duty, and that parents can bring a private cause of action based on this statute. The Brooks also cite I.C. § 33–512(4), which provides that the school district board of trustees have a duty "[t]o protect the morals and health of the pupils." They argue this is a codification of the special relationship between schools and students and thus establishes the duty owed by school officials.

The district court found that the statutory duty codified in I.C. § 33–512(4) did not extend to the circumstances of this case. We disagree. Previously, we have ruled that when the legislature enacted I.C. § 33–512(4), it created a statutory duty which requires a school district to act reasonably in the face of foreseeable risks of harm. *Czaplicki v. Gooding Joint School Dist.*, 116 Idaho 326, 331, 775 P.2d 640, 645 (1989); *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986). We again discussed this statutory duty in *Bauer v. Minidoka Sch. Dist. No.*

*331*, 116 Idaho 586, 778 P.2d 336 (1989). In that opinion we noted that this statutory duty exemplifies the role of the state to the children in school, which is a role described as one *in loco parentis. Id.* at 588, 778 P.2d at 338. We quoted favorably from a Washington opinion which pointed out that "the duty a school district owes to its pupils is '[t]o anticipate reasonably foreseeable dangers and to take precautions protecting the children in its custody from such dangers.'" *Id.* at 590, 778 P.2d at 340 (quoting *Carabba v. Anacortes Sch. Dist. No. 103*, 72 Wash.2d 939, 435 P.2d 936, 946 (1967)).

Thus, under our previous case law we have determined that a school district has a duty, exemplified in I.C. § 33–512(4), to act affirmatively to prevent foreseeable harm to its students. The District made several arguments on appeal, one of which urges the Court to find that no duty arises in this case because the injury occurred off the school grounds. We do not find this argument persuasive. Under the District's rationale, Logan would have a duty to prevent Jeff's suicide if it occurred on the school grounds. Conversely, if he had stepped one foot off the school grounds and committed suicide, no duty would arise. We do not believe this arbitrary line can be drawn. For the purposes of this motion we must assume that the negligence occurred, if at all, while Jeff was attending school and Logan failed to seek help. The result of the alleged negligence is the only element that did not take place on the school grounds. Therefore, we find that the question of whether Logan had a duty to seek help for Jeff is essentially a question that has already been addressed by this Court.

Accordingly, we find that there is a duty which arises between a teacher or school district and a student. This duty has previously been recognized by this Court as simply a duty to exercise reasonable care in supervising students while they are attending school.

## IV.

## OTHER ELEMENTS OF NEGLIGENCE

### A. Breach and Causation

■ The second element of a negligence cause of action, that of breach of duty by the

allegedly negligent party, requires measuring the party's conduct against that of an ordinarily prudent person acting under all the circumstances and conditions then existing. *Alegria v. Payonk*, 101 Idaho 617, 619, 619 P.2d 135, 137 (1980) (citing *Nagel v. Hammond*, 90 Idaho 96, 408 P.2d 468 (1965)). What circumstances and conditions existed is a factual question to be determined by the trier of fact. *Toner v. Lederle Lab.*, 112 Idaho 328, 348, 732 P.2d 297, 317 (1987) (Bakes, J. concurring specially) (citing *O'Connor v. Meyer*, 66 Idaho 15, 154 P.2d 174 (1944)). Thus, the trier of fact will determine what circumstances and conditions existed in Logan's classroom at the time of the suicide, and will compare her actions, or lack of action, to those of an ordinarily prudent teacher acting under such conditions.

■ The third element, causation, requires the trier of fact to determine whether Logan and the District could reasonably have foreseen or anticipated that the failure to refer the student for help might result in injury to that student. *See Alegria*, 101 Idaho at 619, 619 P.2d at 137. Factual issues of proximate cause are again for the jury to resolve, and not the court. *McKinley v. Fanning*, 100 Idaho 189, 190, 595 P.2d 1084, 1085 (1979).

Faced with the conflicting factual question of whether Logan read the journal or whether she could have detected his suicidal thoughts if she had read the journal, for the purposes of this motion this factual dispute must be viewed in the light most favorable to the non-moving party. *Doe v. Durtschi*, 110 Idaho 466, 470, 716 P.2d 1238, 1242 (1986) (quoting *Ashby v. Hubbard*, 100 Idaho 67, 593 P.2d 402 (1979)). The Brooks have submitted an affidavit from Mr. Brooks in which he claims Logan had read the journal prior to Jeff's death. Additionally, the Brooks submitted the affidavit of Dr. Hamilton, which states that based upon his reading of the journal, and clinical interviews with the family, it was apparent that Jeff was suffering from adolescent turmoil and had he been referred for help, his suicide may have been prevented.

■ By submitting these affidavits the Brooks have raised the question of whether Logan had knowledge of Jeff's suicidal thoughts and whether her actions, or inactivity, resulted in Jeff's suicide. A motion for summary judgment must be denied if the evidence is such that conflicting inferences can be drawn therefrom, and if reasonable people might reach different conclusions. *Id.* We therefore leave for the trier of fact the determination of whether the duty has been breached and whether that breach was the cause of the resulting injuries.

## B. Intervening, Superseding Cause

■ Logan and the District argue that Jeff's intentional act of taking his own life is a superseding, intervening cause which relieves them from any liability. We do not find this argument persuasive in light of our previous holdings requiring an act by a third person or other force in order to establish an intervening, superseding cause. In *Mico Mobile Sales & Leasing, Inc. v. Skyline Corp.*, 97 Idaho 408, 546 P.2d 54 (1975), this Court noted that it had adopted the definition of superseding cause from the Restatement (Second) of Torts § 440 (1965).

A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about. (citation omitted)

*Id.* at 411–12, 546 P.2d at 57–58. The concept of supervening causation is inapplicable when the actions were the foreseeable result of the school district's alleged failure to exercise due care to protect its students. *Doe v. Durtschi*, 110 Idaho 466, 472, 716 P.2d 1238, 1244 (1986).

In the present case there is no allegation that a third party or some "other force" was the intervening, superseding cause; rather the very injury which occurred is that which the Brooks maintain was the foreseeable consequence of Logan's and the District's alleged negligence. It is allegedly their negligence which caused Jeff's death, not some third party's intervening action. We note that this doctrine is inapplicable to both the wrongful death action, and the Brooks' cause of action for negligent infliction of emotional

distress. In a situation such as this, we believe the question is more appropriately one of comparative negligence. I.C. § 6–801. It is for the jury to compare the negligence of all the actors, including Jeff, the Brooks, Logan and the District. *Harrison v. Taylor*, 115 Idaho 588, 596, 768 P.2d 1321, 1329 (1989) (citing *McKinley v. Fanning*, 100 Idaho 189, 595 P.2d 1084 (1979)). This is not a determination to be made at summary judgment.

## V.

## CONCLUSION

Based upon the factual dispute arising from the affidavits in the record, and the potential breach of a legal duty owed to Jeff, we find that the motion for summary judgment was improperly granted. We award costs, but no fees, to the appellants.

JOHNSON and SILAK, JJ., concur.

McDEVITT, C.J., concurs in result.

YOUNG, Justice Pro Tem., concurring in part and dissenting in part.

I concur in parts I, II A–B, III A–B–C and dissent from IV A–B, and V for the reasons hereinafter stated.

## I.

## RESTATEMENT OF DUTY OF SCHOOL DISTRICT UNDER PREVIOUS CASE LAW

The majority has stated in part III C that "under our previous case law we have determined that a school district has a duty, exemplified in I.C. § 33–512(4), to act affirmatively to prevent *foreseeable* harm to its students" (emphasis added). As emphasized in *Eisel v. Board of Education*, 324 Md. 376, 597 A.2d 447 (1991), foreseeability is the most important variable in determining whether a tort duty exists, and without it there can be no duty to prevent suicide. "The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances." 57A Am.Jur. 194, *Negligence* § 135.

## II.

## WHAT NOTICE DID LOGAN HAVE THAT JEFF WAS CONTEMPLATING SUICIDE?

The only notice that Logan could have had that Jeff was contemplating suicide must be based upon the contents of Jeff's journal. There is an issue of fact whether Logan read this journal. Therefore, this Court must assume that Logan did read Jeff's journal. Thus, this Court must consider what notice was imparted to Logan from her assumed reading of Jeff's journal. The following excerpts are the only entries in Jeff's journal that make any reference to death or depression by Jeff that could arguably relate to Jeff committing suicide.

Well, Edgar Allen poe, I can live with studying about that stuff he wrote especially the one short story about the evil eye. We read that one last year in English class. I really enjoy poems and short "Horror" storie's. I used to write poems until I pronounced myself dead in one of them and how could I write poems or stories if I was dead??

Really, though, it was accidental that it happened, see, I went into a medium depression and wrote poems to two special people in my life. They were both girls but, anyway, I told them that it was too bad that I had to say goodby this way like that but, it would be the only way and I felt better. I still have those two poems in case I change my mind.

I don't know if I will. I met some old friends recently so I'm here for awhile. I know that you may not be following all this because I really haven't come out right out and said what I meant and since it's a little far fetched. Not many people follow me because I'm so original but, who cares!?!!?

11/6 & 11/7/90

... Some of the things in here which are written have strong emotional standings. There are things that could kill someone. . . .

12/21/90

The rest of Jeff's journal entries vaguely dealt with his problems in writing, his having a "crush" on a girl, some of his personal characteristics, his relationship with his parents, what he expected to receive for Christmas, and his collecting of "unusable or interesting stuff."

In determining whether there is an issue of fact whether Logan knew or should have known that Jeff was contemplating suicide on the basis of his journal entries, one's duty of care must be determined upon the facts as they appeared at the time, and not by the fact that Jeff committed suicide. 37A Am. Jur.2d 195–97, *Negligence* § 136. Therefore, the significance, if any, of the quoted portions of Jeff's journal must not be based on the fact that Jeff committed suicide.

The general rule dealing with the issue of the liability of a person for the suicide of another was stated in *McLaughlin v. Sullivan,* 123 N.H. 335, 461 A.2d 123 (1983), as follows:

> As a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact is responsible for the harm. (citations omitted).

The *McLaughlin* court also recognized that two exceptions to this general rule have been recognized. The exception to the general rule that has possible application under the facts of this case was stated in *McLaughlin* as follows:

> The second exception focuses on the existence of a specific duty of care to prevent suicide. This duty has been imposed as a matter of law (citation omitted), on essentially two classes of defendants, both of whom are held to have a special relationship with the suicidal individual. *The typical defendant in such cases "is someone who has a duty of custodial care, is in a position to know about suicide potential, and fails to take measures to prevent suicide from occurring."* Comment, 1978 Ariz.St.L.J. at 581. *Specifically this duty has been imposed on:* (1) institutions such

as jails, hospitals and reform schools, having actual physical custody of and control over persons (citations omitted); and *(2) "persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide."* (emphasis added) (citations omitted).

This exception to the general rule raises the question whether Logan, who was a high school English teacher, had the special training and expertise which would enable her to determine whether Jeff was mentally ill and/or contemplating suicide on the basis of his journal entries.

**A. Logan's Training as an English Teacher Did Not Enable Her to Determine Whether Jeff Was Mentally Ill and/or Contemplating Suicide.**

Courts have consistently refused to hold that someone who is not a psychiatrist or mental-health trained professional who has had special training and expertise enabling them to detect mental illness and/or the potential for suicide has a duty to prevent suicide from occurring. *See McLaughlin,* 461 A.2d 123 (1983) (lawyers do not have either the expertise or training necessary to judge or foresee that a client will commit suicide or to fashion appropriate responses to such a risk); *Bogust v. Iverson,* 10 Wis.2d 129, 102 N.W.2d 228 (1960) (professor of education with a doctor of philosophy degree is not a person qualified as a medical doctor or a specialist in mental disorders that enabled him to realize need for student's psychiatric treatment or need to advise parents of emotional disturbances); *Eisel v. Board of Education,* 324 Md. 376, 597 A.2d 447 (1991) (student's counselors had duty to warn student's parents of their daughter's suicide threats which were made to friends and reported by them to counselors even though daughter denied making such statements to the counselors).

The distinguishing factual difference between *Eisel,* where a duty was found to exist,

and *McLaughlin* and *Bogust,* where no duty was found to exist, is that in *Eisel* there was direct evidence that suicide was planned by the decedent in question and there was no need for special training to foresee that the decedent intended to commit suicide; while in *McLaughlin* and *Bogust,* the suicide was held to be unforeseeable and no duty to take affirmative action to prevent suicide existed because each of the defendants lacked the special training required to detect mental illness and/or the potential for suicide to foresee that the deceased intended suicide.

Under this authority and reasoning, the suicide of Jeff should be held to be unforeseeable by Logan and that she had no duty to take any affirmative action to prevent his suicide because of her lack of special training to detect mental illness and/or the potential for suicide of Jeff.

**B. No Evidence Has Been Submitted Which Raises an Issue of Fact Whether Logan Knew or Should Have Known From Jeff's Journal Entries That He was Mentally Ill and/or Contemplating Suicide.**

The appellants tacitly acknowledge that the determination of whether Jeff was mentally ill and/or contemplating suicide is a medical issue which could only be determined by mental-health trained professionals by obtaining the services of Dr. Read, who is a psychologist with special training and expertise to enable him to detect mental illness and/or the potential for Jeff to commit suicide.

However, Dr. Read did not make his diagnosis on the basis of Jeff's journal entries alone. He also conducted clinical interviews of James and Diane Brooks. *See* Dr. Read's affidavit, para. 3. Thus, his opinion is not based upon the facts as they appeared at the time Jeff submitted his journal to Logan. Furthermore, there is no way of knowing how much Dr. Read's diagnosis is based upon his after-the-fact knowledge that Jeff had committed suicide.

Dr. Read's diagnosis that Jeff was "suffering from fairly common adolescent turmoil surrounding a girl friend, his identity and issues of rebellion," standing alone, is mean-ingless in the sense that there are probably times when every adolescent could be similarly diagnosed. Furthermore, this diagnosis does not indicate in any way how Logan, as a high school English teacher, could be expected to determine that Jeff was mentally ill and/or contemplating suicide on the basis of Jeff's journal entries.

Dr. Read's statement that "had Jeffrey Brooks been timely referred to a competent professional counselor or psychologist, ... his suicide would have been avoided," is pure speculation that should not be relied upon as raising any factual issue in this case.

We can reasonably assume that Jeff had suicidal thoughts because he committed suicide. However, there is no evidence in the record when he had those suicidal thoughts or that those suicidal thoughts were communicated to Logan. One may suspect, question or speculate whether Jeff was making reference to some prior suicidal thoughts in the quoted excerpts from his journal. However, those statements alone are not admissible evidence that he was having suicidal thoughts at the time he wrote them in his journal.

### III.

### CONCLUSION

As the trial court stated in *Bogust:*

To hold that a teacher who has had no training, education or experience in medical fields is required to recognize in a student a condition the diagnosis of which is in a specialized and technical medical field would require a duty beyond reason.

102 N.W.2d at 230.

On the basis of the foregoing reasoning and authorities, I would affirm the action of the district court in granting summary judgment in favor of the defendants.