# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38248

| | | |
|---|---|---|
| SUZETTE Y. BOLLINGER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FALL RIVER RURAL ELECTRIC | ) | Boise, January 2012 Term |
| COOPERATIVE, INC., an Idaho | ) | |
| corporation, | ) | 2012 Opinion No. 36 |
| | ) | |
| Defendant-Respondent, | ) | Filed: March 1, 2012 |
| | ) | |
| and | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| BRYAN CASE, LARRY HAMILTON and | ) | |
| DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Fremont County. Hon. Darren B. Simpson, District Judge.

The judgment of the district court is <u>affirmed.</u>

Cox, Ohman & Brandstetter, Chtd., Idaho Falls, for appellant. John M. Ohman argued.

Rigby, Andrus & Rigby, Rexburg, and Ater Wynne LLP, Portland, Oregon, for respondent. Lori Irish Bauman argued.

_____

J. JONES, Justice.

This appeal arises from Fall River Rural Electric Cooperative, Inc.'s termination of an employee, Suzette Bollinger. Bollinger appeals the district court's grant of summary judgment to Fall River on all of her claims. Because we find that Bollinger was an at-will employee at the time of her discharge and Fall River breached no contractual or tort duty to her in terminating her employment, we affirm.

1

## I.
## FACTS AND PROCEDURAL HISTORY

Fall River hired Bollinger to work as a cashier and receptionist at its Ashton headquarters in October 1988. She was promoted to the position of Energy Auditor in 1993 and also assumed the position of Member Services Representative in 2006. She continued in those positions until February 2008, when she assumed the position of Safety & Loss/Facility Director. Bollinger's employment with Fall River was terminated in July 2009. Bollinger's performance was satisfactory at all times, and it is undisputed that her discharge was without cause.

Although Bollinger alleged in her Complaint that she signed an employment contract at the time of her hiring, she failed to produce that contract or any evidence of its contents. Fall River's termination policy changed several times throughout Bollinger's employment. At the time of her hire in 1988, Fall River had a "for-cause" termination policy for regular employees, with an exception for layoffs due to a lack of work. Fall River also maintained an "Employee Seniority" policy, adopted in 1977, which provided that employees would be given preference for employment seniority with Fall River in regard to "promotions, demotions, transfers, lay-offs and recalls."[1] In October 2004, Fall River adopted a "Work Standards and Personal Conduct Policy," which detailed the Cooperative's disciplinary policy and stated that "[e]mployment with the Cooperative is voluntary and may be terminated by the employee or the Cooperative at any time for any lawful reason." The 2004 policy expressly superseded any prior conflicting policy. The record is unclear how this policy was distributed and whether Bollinger received notice of it, but her affidavit shows that she was generally aware of Fall River's employment policies.

In March 2009, Fall River adopted an "Employment-At-Will" policy**,** which provided:

> All employees who do not have a separate, individual written employment contract for a specific fixed term of employment are employed at the will of the company and may be terminated by the company at any time, for any reason, with or without notice, except as prohibited by law or the express provisions of any applicable labor agreement. Any contract or agreement that specifies a fixed term of employment must be approved by the board of directors and signed by the president [or] general manager of the company.

The 2009 policy also provided:

---

[1] Fall River maintained a seniority list along with this policy, and Bollinger was number 26 on the list in 2004. At her deposition, she claimed that she was number 18 on the list by the time of her termination.

> Nothing contained in this manual, employee handbooks, employment applications, Cooperative memoranda, or other materials provided to employees in connection with their employment require the Cooperative to have just cause in order to terminate any employee at any time or for any reason. Provided, however, that the Cooperative will not terminate any employee for reasons that violate state or federal law, or the express provisions of any applicable labor agreement.

The 2009 policy also expressly superseded any prior conflicting policy. On April 6, 2009, Fall River distributed this policy to all employees via email, and Bollinger admits that she received that email.

In 2007, Fall River created the position of Safety & Loss/Facility Director to oversee safety programs and report to the Operations Manager and promoted Bollinger to that position on February 28, 2008. Bollinger's duties in that position involved implementing and carrying out state and federal laws and regulations, including conducting monthly safety meetings, overseeing safety programs required by the Occupational Safety and Health Administration (OSHA), maintaining safety compliance records, following up on accident investigations, purchasing safety equipment, and performing safety and compliance inspections. Bollinger was also responsible for reporting to Fall River's management any failure to comply with an applicable safety law, rule, or regulation.

According to Bollinger, Fall River General Manager Bryan Case refused to take measures to remedy safety compliance issues Bollinger brought to his attention, ignored requirements for equipment, and became hostile toward her.[2] According to Case, Fall River took remedial action on most safety issues raised by Bollinger, although admittedly not as quickly as Bollinger preferred. According to Case, Fall River spent more on safety in 2009 than any recent year. Although she

---

[2] Specifically, Bollinger testified in her deposition that as part of her job duties, she raised several safety issues to Case and others, but the record is unclear as to whether and to what extent her suggestions were actually met with adversity. First, she was concerned when a new budget failed to provide money for protective clothing she believed was legally mandated by the National Electrical Safety Code and discussed the situation with Operations Manager Larry Hamilton, who also realized the need. By March 2009, funding was supplied for the minimum amount of clothing. Second, she was informed by Fall River's insurer about Fall River's irregular fire extinguisher inspection, improper railing at one of Fall River's offices, and damaged stairs at another Fall River location. She relayed this message to Fall River management and apparently had "heated discussion[s]" with Case about costs associated with the fire extinguisher and railing issues. She subsequently conducted a spot check of the extinguishers and was waiting for a less-expensive bid on the railing when she was discharged. Third, Bollinger made an "official recommendation" to Fall River that employees should wear steel-toed boots, which was not implemented because Fall River already had hard metal protective coverings for boots in its warehouse—although they were awkward for employees to wear. Finally, there is some suggestion in Bollinger's deposition of an oil spill that occurred in May 2009, which Bollinger believed was not timely reported as required by law. However, it is unclear what part, if any, Bollinger had in raising this issue with her superiors.

testified that she kept notes on the alleged safety violations to protect herself, Bollinger never reported or threatened to report any safety issues at Fall River to OSHA or any other regulatory authority.

On July 29, 2009, Bollinger was called into a meeting with Case and others and told that her position had been eliminated and her employment with Fall River had been terminated. She was given a severance agreement to take home and review, escorted to her office, and told to gather her personal items. She was given thirty minutes to do so, and two superiors helped box her belongings. According to Bollinger, she felt rushed and the superiors told her to hurry because they had a meeting to attend. She was offered a ride home but declined and was later given at least two letters of recommendation from her superiors at Fall River.

According to Fall River, Bollinger's termination was part of a larger reduction in workforce to address budgetary concerns related to the recession. Case's affidavit pointed out that on May 11, 2009, Fall River offered an early retirement package to certain senior employees, five of whom chose to participate. Subsequently, Case recommended to Fall River's Board of Directors the elimination of five additional positions, one of which was Bollinger's, and that recommendation was approved on July 27, 2009. Bollinger's position was reabsorbed by the Operations Manager, who previously oversaw and administered Fall River's safety programs. According to Bollinger, the minutes of the Fall River Board of Directors meetings around the time of her termination show that it was not experiencing any financial problems. However, as the district court found, those minutes contain references to "the economic downturn, potential stimulus money, cost-cutting, curbing unnecessary spending, rate increases, postponement of a building project, interest rate expense increases, efficiency increases, and an investigation into administrative costs."

Bollinger sued Fall River for: (1) breach of express and implied contract, including breach of the covenant of good faith and fair dealing; (2) retaliatory discharge and wrongful termination in violation of public policy; and (3) negligent and intentional infliction of emotional distress. The district court granted summary judgment to Fall River on all of Bollinger's claims. The district court also denied Bollinger's motion for reconsideration, and she timely appealed to this Court.

## II.
### ISSUES ON APPEAL

I. Did the district court err in granting summary judgment on Bollinger's breach of employment contract claim?

II. Did the district court err in granting summary judgment on Bollinger's claim for

4

breach of the implied covenant of good faith and fair dealing?

III.    Did the district court err in granting summary judgment on Bollinger's claim for retaliatory discharge and termination in violation of public policy?

IV.    Did the district court err in granting summary judgment on Bollinger's claims for negligent and intentional infliction of emotional distress?

V.    Is Bollinger entitled to attorney fees on appeal?

## III.
## DISCUSSION

### A.    Standard of Review

"This Court reviews a motion for summary judgment pursuant to the same standards as the district court." *Mackay v. Four Rivers Packing Co.*, 145 Idaho 408, 410, 179 P.3d 1064, 1066 (2008). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c). "[A]ll reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party," and disputed facts will be liberally construed in favor of the nonmoving party. *Mackay*, 145 Idaho at 410, 179 P.3d at 1066. However, the nonmoving party cannot rely on mere speculation, and a scintilla of evidence is insufficient to create a genuine issue of material fact. *Van v. Portneuf Med. Center*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009). This Court reviews questions of law *de novo*. *Martin v. Camas County ex rel. Bd. of Comm'rs,* 150 Idaho 508, 511, 248 P.3d 1243, 1246 (2011).

### B.    The district court properly granted summary judgment on Bollinger's breach of employment contract claim because she was an at-will employee at the time of her termination.

On appeal, Bollinger asserts that Fall River breached its express or implied employment agreement with her by terminating her without cause. Bollinger argues that (1) the for-cause policy maintained by Fall River when she was hired remained in effect at the time of her termination, (2) Fall River implemented an at-will policy solely to allow her termination, and (3) Fall River's policy of giving preference to senior employees somehow limited its ability to terminate Bollinger. Fall River responds that Bollinger was an at-will employee at the time of her termination by virtue of the 2004 and 2009 policies, which contained at-will employment language and expressly superseded the prior for-cause policy. Further, Fall River argues that Bollinger was terminated for economic reasons in accordance with an exception to the prior for-cause policy, and

5

that Bollinger has failed to raise a material issue of fact whether the at-will policy was implemented for the purpose of her termination. The district court found that Bollinger was an at-will employee at the time of her termination and, even if the for-cause policy remained in effect, she was laid off for economic reasons in accordance with that policy.

Employment in Idaho is presumed to be at will unless the employee is hired pursuant to a contract that states a fixed term or limits the reasons for discharge. *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 240–41, 108 P.3d 380, 387–88 (2005); *Mitchell v. Zilog, Inc.*, 125 Idaho 709, 712, 874 P.2d 520, 523 (1994). In the absence of an express contract, a limitation to the at-will employment presumption may be implied where the circumstances surrounding the employment relationship could cause a reasonable person to conclude that the parties intended a limitation on discharge. *Id.* Statements made and policies promulgated by the employer, whether in an employment manual or otherwise, may give rise to such an implied-in-fact agreement. *See id.* However, such statements must be more than vague statements of opinion or prediction, and policies must manifest an intent that they become part of the employment agreement. *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 624, 778 P.2d 744, 746 (1989); *Atwood v. Western Const., Inc.*, 129 Idaho 234, 238, 923 P.2d 479, 483 (Ct. App. 1996). In the absence of a written agreement, this Court has held that an employer may unilaterally change the employment agreement by uniformly providing reasonable notice of the change to its affected employees; the employees accept by continuing to work following receipt of such notice. *Watson v. Idaho Falls Consolidated Hospitals, Inc.*, 111 Idaho 44, 48, 720 P.2d 632, 636 (1986); *Parker v. Boise Telco Fed. Credit Union*, 129 Idaho 248, 254, 923 P.2d 493, 499 (Ct. App. 1996).

Here, we find that Bollinger was an at-will employee at the time of her discharge, and she has failed to point to any circumstances that would create an implied-in-fact limitation on her at-will employment status. First, although Bollinger alleged in her complaint that she signed an employment contract at the time of her hire, she produced no evidence of that contract or its content at summary judgment. Second, although it is undisputed that Fall River maintained a for-cause employment policy at the time of Bollinger's hire, it effectively adopted a change to that policy at least as of April 6, 2009. The 2009 at-will employment policy clearly stated the employer's intent to create an at-will employment relationship with all employees not covered by a separate, written employment agreement, and on April 6, 2009, it was uniformly distributed to all employees, including Bollinger, via email. Under *Watson*, Bollinger impliedly accepted that

6

change by continuing to work at Fall River following that notification.[3]  Further, although Bollinger attempts to argue that the for-cause policy somehow remained in effect, the 2009 policy expressly superseded any prior conflicting policy, including the for-cause policy on which she relies.

Further, Bollinger has failed to point to any other specific circumstances that could reasonably cause her to believe her employment was protected.  She asserts that she believed she could retire from Fall River based on statements of her hiring supervisors and the longevity of other employees, but she does not pinpoint any particular statement or affirmative conduct that would support that belief.  Such a vague assertion cannot give rise to an implied-in-fact for-cause relationship, particularly in light of the express at-will policy of which Bollinger undisputedly received notice.  Additionally, the employee seniority policy on which Bollinger heavily relies does not affect our conclusion.  Under *Metcalf*, a policy must indicate an intent that it become part of the employment agreement.[4]  The seniority policy expressly stated that it did not constitute a contract between the employer and employee.  Even if the seniority policy did become part of the employment agreement, Bollinger's reading of the seniority policy to somehow limit Fall River's right to discharge senior employees directly conflicts with its subsequent at-will employment policy, which expressly superseded all prior conflicting policies.  The promulgation of the at-will policy alone renders unreasonable any belief that Bollinger's employment was protected.  Thus, Bollinger's status as a long-term employee did not affect Fall River's right to terminate her employment at will.[5]

Finally, Bollinger's argument that Fall River adopted its at-will employment policy solely for the purpose of discharging her is unsupported by the record.  Bollinger does not dispute that

---

[3] Additionally, the 2004 policy—which outlined employee discipline—expressly stated that those disciplinary guidelines were not intended to create a contract or "guarantee of employment," and that employment was "voluntary" and could be terminated at any time by either party.  Such language would also have changed Bollinger's employment status to at-will, but the record is unclear whether the affected employees were uniformly notified of it.  Although Bollinger stated she was generally familiar with Fall River's policies, this Court—drawing all inferences in favor of Bollinger—cannot find as a matter of law that it was adequately distributed as required under *Watson*.

[4] "Unless an employee handbook specifically negates any intention on the part of the employer to have it become a part of the employment contract, a court may conclude from a review of the employee handbook that a question of fact is created whether the handbook was intended by the parties to impliedly express a term of the employment agreement." *Metcalf*, 116 Idaho at 624, 778 P.2d at 746.

[5] Even if the for-cause policy remained in effect, Fall River did not breach its employment contract.  As the district court found, that policy had an exception for terminations for lack of work, and Bollinger has not raised a genuine factual issue that that was not the reason for her termination.

7

Fall River implemented an early retirement program prior to her termination, or that she was terminated as part of a wider consolidation that affected four other employees. She makes only vague assertions that Case had been opposed to her recommended safety measures and became "hostile," but her deposition testimony reveals only two heated discussions and eventual solutions to almost all of the issues she reported. She also argues that the minutes of the Fall River Board of Directors show that it was not dealing with effects of the recession. However, as indicated above, the minutes indeed show Fall River's economic concerns, and Case's general attitude toward Bollinger's recommendations alone does not raise a genuine issue of material fact regarding the reason for her discharge. Such evidence constitutes no more than a mere scintilla that cannot defeat a motion for summary judgment. Thus, the district court properly granted summary judgment on Bollinger's breach of contract claim.

C. **The district court properly granted summary judgment on Bollinger's good faith and fair dealing claim because she failed to identify a contractual duty that Fall River failed to perform in good faith.**

Bollinger also argues that Fall River breached the covenant of good faith and fair dealing by terminating her without cause, asserting that the 2009 at-will employment policy was implemented by Case for the sole purpose of getting rid of her. Bollinger also argues that Fall River breached this duty by failing to "bump her back" to a position she had previously held, rather than discharge her, as she believes the seniority policy required. Fall River asserts that it had no contractual duty to discharge Bollinger only for cause or to merely demote her and, accordingly, the duty of good faith and fair dealing was not breached upon her discharge without cause. Further, it argues again that Bollinger has failed to raise a genuine factual issue as to whether the at-will policy was implemented solely to enable her discharge. Fall River's argument echoes the district court's findings.

The covenant of good faith and fair dealing, which is implied in all employment agreements, requires the parties to perform in good faith the obligations contained in their agreement. *Van*, 147 Idaho at 562, 212 P.3d at 992. A violation occurs when either party violates, qualifies, or significantly impairs any benefit or right of the other party under the agreement. *Id.* However, the covenant does not create new duties that are not inherent in the agreement itself and, thus, cannot create a for-cause termination limitation in an at-will employment agreement. *Id.*; *Jenkins*, 141 Idaho at 242–43, 108 P.3d at 389–90.

As discussed above, Bollinger was an at-will employee at the time of her discharge by

8

virtue of Fall River's 2009 at-will employment policy, and the seniority policy did not create any binding limitation on Fall River's right to terminate her employment. Accordingly, Fall River did nothing more than exercise its contractual right when it terminated Bollinger's employment. Further, as discussed above, Bollinger has failed to produce more than a scintilla of evidence that Case promulgated the 2009 policy for the sole purpose of carrying out some personal vendetta against her. The only rational inference to be drawn from the facts in the record is that the change in policy was a properly adopted, workplace-wide modification to the employment agreement rather than a deliberate impairment of Bollinger's rights. Therefore, the district court properly granted Fall River summary judgment on Bollinger's good faith and fair dealing claim.

> **D.** **The district court properly granted summary judgment on Bollinger's claims for retaliatory discharge and termination in violation of public policy because she was not engaged in protected activity and failed to demonstrate a factual issue regarding the motivation behind her discharge.**

Bollinger next argues that she was wrongfully terminated in retaliation for reporting several safety issues to Fall River management, and such termination was in violation of public policy. She also argues that Fall River's failure to "honor all personnel policies" with respect to her was a violation of public policy. Fall River responds that Bollinger was not engaged in "protected activity" necessary to trigger the public policy exception because her safety reports were required by her job duties. Further, the record does not support an inference that she was terminated in retaliation for those reports. Fall River also argues that a mere failure to honor policies does not fall into the public policy exception to at-will employment. The district court did not expressly address whether Bollinger was engaged in protected activity, but found that the record did not support any rational inference that her discharge was related to her safety reports.

This Court recognizes a narrow exception to the at-will employment presumption where the employer's motivation for the termination contravenes public policy. *Van*, 147 Idaho at 561, 212 P.3d at 991. This public policy exception is triggered only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges. *Id.* Whether an employee is engaged in protected activity is a question of law. *Id.* In determining whether activity is protected, this Court analyzes (1) whether there is a public policy at stake sufficient to create an exception to at-will employment, and (2) "whether the employee acted in a manner sufficiently in furtherance of that policy." *Thomas v. Med. Center Physicians, P.A.*, 138

9

Idaho 200, 208, 61 P.3d 557, 265 (2002). The claimed public policy generally must be rooted in "case law or statutory language." *Edmondson v. Shearer Lumber Prod.*, 139 Idaho 172, 177, 75 P.3d 733, 738 (2003). If an employee is engaged in a protected activity and subsequently terminated, the employee must also show that her termination was in fact motivated by her participation in that activity. *Id.* Although that question of causation is generally one for the jury, it may be decided as a matter of law where there exists no genuine issue of fact. *See Thomas*, 138 Idaho at 208, 61 P.3d at 265.

As an initial matter, Bollinger's argument that Fall River's failure to honor its employment policies triggers the public policy exception is without merit. As discussed above, Bollinger has not shown that Fall River failed to honor any binding employment policy in place at the time of her discharge. Even to the extent that it did, a mere failure to adhere to an employer's private policies, without more, does not fall within any of the narrow public policy exception prongs outlined above. In the same vein, Fall River's argument that any activity required by Bollinger's job duties cannot be "protected activity" is also without merit. Although the policy sought to be protected indeed must be a *public* policy, performance of duties required by an employer can rise to the level of protected activity when such performance also sufficiently furthers public policy. *See Ray v. Nampa School Dist.*, 120 Idaho 117, 121, 814 P.2d 17, 21 (1991). Indeed, the entire purpose of the exception would be thwarted if it was deemed inapplicable whenever public policy aligned with the duties of the job.

Here, however, Bollinger fails to pinpoint any particular statute or regulation that would support her claim that her reports of safety issues implicated a public policy sufficient to justify an exception to at-will employment. Although we have recognized that reporting of safety violations may constitute protected activity,[6] we also require identification of the source of the public policy that would trigger the exception. *Edmondson*, 139 Idaho at 177, 75 P.3d at 738. Bollinger's affidavit in opposition to summary judgment only vaguely asserts that Case "refused to implement or to follow safety rules and regulations of which [Bollinger] made him aware … and ignored requirements for equipment; procedures; and regulations." Nowhere in her briefing below or on appeal does Bollinger identify a legal source for those alleged rules and regulations.

---

[6] *Ray*, 120 Idaho at 121, 814 P.2d at 21 (finding that an electrical maintenance worker's reports of building and electrical code violations to the state electrical engineer was protected activity); *Thomas*, 138 Idaho at 208, 61 P.3d at 265 (finding that a report in furtherance of public policy does not necessarily have to be made to an outside entity to be protected).

A closer look at the record reveals little more. Although Bollinger mentions OSHA generally in her deposition testimony, she never associates any of her complaints with specific OSHA regulations. She only mentions that the safety clothing she requested funding for was required by the National Electrical Safety Code (NESC), but that code is not legally binding on Fall River.[7] In fact, she specifically states that OSHA had not adopted requirements for the clothing at the time of her report. Although the state does have a general public policy interest in maintaining a safe workplace, the public policy exception would swing too wide if it protected advocacy of any of the infinite number of safety measures employers could take, regardless of whether they were required by law.[8] Bollinger's remaining complaints to Fall River superiors are unlinked to any specific legal requirement, and several of them were initially raised by Fall River's insurer rather than Bollinger. Raising concerns at the behest of an insurer primarily furthers only private interests, and Bollinger fails to identify any independent public obligation that prompted those reports.

In addition, Bollinger has failed to create a genuine issue of fact that her termination was motivated by her safety reports. As discussed above, Bollinger adduced no facts that would support a reasonable inference that she was terminated for any reason other than economic consolidation. She generally alleges that Case was adverse to her safety reports and became "hostile" toward her, but that alleged behavior is not demonstrated in the record. Almost all of the reported issues were either solved or in the process of being solved when Bollinger was discharged, and two "heated discussions" are the only traces of hostility to be found. Even to the extent that the evidence demonstrates some adversity, Bollinger identifies no evidence that would link that adversity to her discharge, but rather rests on mere speculation. On the other hand, Fall River produced evidence that it had previously implemented an early retirement program, terminated four other employees along with Bollinger, and reassigned Bollinger's duties to the Operations Manager. Contrary to Bollinger's assertion, Fall River's board meeting minutes support that these measures were motivated by economic concerns. In all, a fact-finder could not

---

[7] Although the Idaho Public Utilities Commission adopts the National Electrical Safety Code by reference in its regulations (IDAPA 31.11.01.101), cooperatives such as Fall River are not subject to the Commission's jurisdiction. *Clearwater Power Co. v. Wash. Water Power Co.*, 78 Idaho 150, 299 P.2d 484 (1956).

[8] "The purpose of the exception is to balance the competing interests of society, the employer, and the employee in light of modern business experience." *Crea v. FMC Corp.*, 135 Idaho 175, 178, 16 P.3d 272, 275 (2000). Granting Bollinger protection for her reports of safety issues when she has not linked those issues to any definite public obligation would upset this balance.

rationally find that Bollinger's discharge was motivated by her safety reports. Thus, we find the district court correctly granted summary judgment on this claim.

> **E.** **The district court properly granted summary judgment on Bollinger's claims of negligent and intentional infliction of emotional distress.**

Bollinger also argues that the district court erred in granting summary judgment on her negligent and intentional infliction of emotional distress (NIED and IIED) claims. As for her NIED claim, she takes issue with the district court's findings that Fall River did not breach a legal duty to her and that Bollinger demonstrated no physical manifestations of her emotional distress. Fall River responds that her NIED claim is preempted by state workers' compensation law and, regardless, no legal duty is breached by the firing of an at-will employee. Further, Fall River argues that Bollinger showed no physical manifestation of her distress. As for Bollinger's IIED claim, she takes issue with the district court's finding that Fall River's behavior was not extreme and outrageous. Fall River echoes the district court's finding.

> **1.** **Negligent Infliction of Emotional Distress**

Although workers' compensation is the exclusive remedy for an employee's injuries arising out of and in the course of employment, a tort action may be maintained against the employer if the injury is not compensable under workers' compensation. *Roe v. Albertson's, Inc.*, 141 Idaho 524, 530, 112 P.3d 812, 818 (2005). NIED is a negligence action, requiring a showing of (1) a legally recognized duty, (2) a breach of that duty, (3) a causal connection between the defendant's conduct and the breach, and (4) actual loss or damage. *Johnson v. McPhee*, 147 Idaho 455, 466, 210 P.3d 563, 574 (Ct. App. 2009) (citing *Brooks v. Logan*, 127 Idaho 484, 489, 903 P.2d 73, 78 (1995)). Additionally, the plaintiff must demonstrate physical manifestation of the alleged emotional injury. *Johnson*, 147 Idaho at 466, 210 P.3d at 574 (citing *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank*, 119 Idaho 171, 177, 804 P.2d 900, 906 (1991)). An employer does not breach a legal duty to an at-will employee simply by terminating her without cause. *See Sorenson v. St. Alphonsus Reg'l Med. Ctr.*, 141 Idaho 754, 761–62, 118 P.3d 86, 93–94 (2005).

As an initial matter, the district court was correct that Bollinger's NIED claim is not preempted by the workers' compensation law. The type of injury covered under workers' compensation is that "caused by an accident, which results in violence to the physical structure of the body." *Roe*, 141 Idaho at 531, 112 P.3d at 819 (quoting I.C. § 72-102(17)(c)). An accident is an "unexpected, undesigned, and unlooked for mishap, or untoward event." *Id.*, (quoting I.C. § 72-102(17)(b)). The injury Bollinger claims was not caused by violence to the body but rather

12

emotional distress unrelated to any physical injury. As such, it is not the type of injury contemplated by the workers' compensation law. Further, although Bollinger seeks recovery under a negligence cause of action, her alleged injury was not caused by the type of "accident" contemplated by Idaho Code. The conduct of Fall River—its discharge of Bollinger—was planned. As such, Bollinger's NIED claim is not preempted by the workers' compensation law.

However, we find that Bollinger's NIED claim was properly dismissed as a matter of law because she pinpoints no legal duty that was breached by her termination. As this Court noted in *Sorenson*, the mere termination of an at-will employee—without more—does not constitute the breach of a duty sufficient to support an NIED claim. As such, Bollinger's claim that Fall River breached a duty to her by terminating her in disregard of its employment policies is without merit. As discussed above, Bollinger was an at-will employee and, therefore, Fall River could legally terminate her at any time, for any reason. Although the parties also dispute whether she showed physical manifestation of her emotional injury, we need not reach that question because Bollinger's claim fails at the duty stage. Accordingly, the district court correctly granted summary judgment on Bollinger's NIED claim.

### 2. Intentional Infliction of Emotional Distress

To recover on a claim of IIED, the plaintiff must show that: (1) the defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the conduct and the emotional distress, and (4) the emotional distress was severe. *Nation v. State Dep't of Correction*, 144 Idaho 177, 192, 158 P.3d 953, 968 (2007). To support an IIED claim, conduct must be more than merely "unjustifiable," but rather must rise to the level of "atrocious" behavior "beyond all possible bounds of decency." *Edmondson*, 139 Idaho at 180, 75 P.3d at 741.

Here, although Fall River's conduct in terminating Bollinger's employment was intentional, it certainly was not extreme and outrageous. As discussed above, Bollinger was an at-will employee, so the simple fact that she was discharged without cause cannot constitute extreme and outrageous behavior. Further, although Bollinger's discharge was abrupt and the time she was given to pack her office relatively rushed, such conduct is not atrocious or beyond all possible bounds of decency. In fact, escorting an employee who has just been terminated from the building in a timely fashion is an acceptable means to minimize disruption in the workplace. In addition, as the district court aptly stated, "Fall River took pains to velvet the termination hammer" by offering

13

her a ride home, allowing her to return for additional items from her office, and writing letters of recommendation on her behalf. Accordingly, the district court properly granted summary judgment based on Bollinger's failure to demonstrate extreme and outrageous conduct.

**F.      Bollinger is not entitled to attorney fees on appeal.**

Finally, Bollinger claims that she is entitled to attorney fees on appeal, citing Idaho Appellate Rule 41. Bollinger is not the prevailing party and not entitled to fees.[9]

## IV.
## CONCLUSION

For the reasons discussed above, we affirm the district court's grant of summary judgment to Fall River on all of Bollinger's claims. Fall River is awarded its costs on appeal.


Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.

---

[9] In any event, Rule 41 is not a statutory provision authorizing the award of attorney fees. Rather, it is a court rule establishing the procedure for requesting and determining a fee award when a statute or contract makes one available.